ELLIOT S. EPSTEIN *et al.*, Plaintiffs and Counterdefendants-Appellees, *v.* CLAYTON L. YODER, Defendant and Counterplaintiff-Appellant.

First District (5th Division)    No. 78-1057

Opinion filed June 1, 1979.

Arthur S. Gold, of Kaplan, Gold, and Gallagher, Ltd., of Chicago, for appellant.

Sachnoff, Schrager, Jones, Weaver & Rubenstein, Ltd., of Chicago (Ellis B. Rosenzweig and Arnold Pagniucci, of counsel), for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Clayton Yoder (defendant) appeals from the grant of summary judgment in favor of Elliot S. Epstein, Lewis Manilow, Lowell E. Sachnoff, Leonard Jay Schrager, Richard C. Jones, and William N. Weaver, Jr., d/b/a Epstein, Manilow and Sachnoff (plaintiffs) and from the dismissal of his second amended counterclaim against plaintiffs. On appeal, he contends that the trial court (1) improperly granted summary judgment because (a) the issues should have been submitted to arbitration and (b) material issues of fact existed; (2) erred in finding that his second amended counterclaim failed to state a cause of action; and (3) erred in failing to find him to be a "withdrawing party" as that term is used in the contract.

In 1967, plaintiffs (a law firm); defendant (a mortgage banker); Altman & Saichek & Associates (an architectual firm); and Jack Shaffer (a real estate broker) formed a joint venture to construct and manage as rental property a 50-unit apartment building. Initially, each of the four original venturers owned 25% of the venture, but when Shaffer failed to participate in the management and operation of the venture, his share was decreased while the remaining shares were proportionally increased. In 1969, 20% of the venture was sold to Donald Green and Ethel Goldenberg, each of whom received a 10% ownership interest while the shares of the original venturers were proportionally reduced.[1] In 1971, a disagreement arose among the venturers, with the result that on July 9 the joint venture agreement was reduced to writing and executed by the four original venturers.

Except as otherwise provided in this agreement, no venturer has the authority to act for or to assume any obligation on behalf of another venturer, and all venturers must agree to the sale of the building or to any other decision which would reasonably be expected to have a material effect on the venture. Concerning financing, however, it was provided that should the revenues generated by the building fail to cover the cost of its operation, any venturer may advance a coventurer's unpaid share of such deficit. Moreover, where such payments or advances are made prior to the service of a notice of default (as defined in article VII relating to termination), the amount thereof together with 8% interest during such time as they remain outstanding is recoverable by a suit at law against the noncontributing coventurer.

Article VII delineates three circumstances which could bring about the termination of the venture. One is the failure of a venturer to perform

---

[1] The interests at that time were: Yoder, 22%; Schaffer, 14%; EM&S, 22%; Altman-Saichek, 22%; Green, 10%; and Goldenberg, 10%.

any of his respective obligations under the terms of the agreement.[2] Such failure entitles any other venturer to serve a notice of default upon the delinquent venturer setting forth the nature of the unperformed obligation. If within 30 days following receipt of the notice, the defaulting party in good faith commences to perform such obligation and thereafter diligently cures the default, the venturers shall consider the notice as not having been sent and the defaulting party loses no rights under the agreement. If, on the other hand, the defaulting party fails either to commence or to diligently prosecute the completion of a cure of the default, the nondefaulting parties acting unanimously may declare the venture terminated, in which case the defaulting party would be deemed a withdrawing party. In the event of a termination, the nonwithdrawing venturers may elect to institute appraisal procedures which, while forcing the sale of the defaulting party, do not operate as a waiver of other remedies, if any, which may be available at law or in equity.

The institution of such appraisal proceedings envisions the purchase of the withdrawing venturer's ownership interest in the venture at the appraised value thereof. In doing so, the nonwithdrawing parties each select one disinterested M.A.I. appraiser familiar with the value of multiple-unit apartment buildings in the western suburbs of Chicago. The appraised value of the building is the mean of the appraisers' independent determinations of the value of the building, its fixtures, and tangible personal property. That amount is then increased by the value of intangible assets owned by the venture. The withdrawing party's pro rata share of the resultant amount is decreased by his pro rata share of the venture's liabilities including mortgages, real estate and other property taxes, liens, etc. If the interest of the withdrawing party is positive, the contract provides for its purchase by the other venturers within 30 days of its computation; whereas, if the interest is negative, the withdrawing party is required to pay the deficit to the venture in cash within the same time period. The contract provides that the purchase of a positive interest would occur in a series of rounds at a meeting of the nonwithdrawing partners. In round one thereof, each may purchase a portion of such interest not in excess of his percentage of ownership in the venture as a whole. If at the conclusion of the first round an unpurchased portion of the withdrawing party's interest remains, the nonwithdrawing parties may by a similar procedure, and to the extent of their percentage of ownership in the venture, purchase further amounts of such remainder. If it should happen that a portion remains unpurchased and an agreement among the nonwithdrawing parties cannot be reached regarding its disposition, it is

---

[2] The other two circumstances with which we are not concerned here are the voluntary withdrawal or the insolvency of a venturer. Either would work a termination of the venture and such venturer would be deemed a withdrawing party under the contract.

provided that the building be sold by the venturers for the best possible price within one year of the notice of default and, if it is not so sold, it is required that the building be placed with a disinterested and capable real estate broker who will be authorized to accept any commercially reasonable offer. The cost of appraisal and half of the cost of the brokerage fee in the event of such sale are to be borne by the defaulting party. Moreover, it is further provided that in the event the withdrawing party's entire ownership interest in the venture is purchased by the nonwithdrawing parties, the venture would be terminated and immediately be re-created with the only change being a reallocation of the percentage of ownership interests of the remaining venturers, with all terms, agreements, obligations and benefits binding on the remaining parties to the venture so re-created.

Other provisions of the joint venture agreement state that all original venturers were to extend their best efforts to procure refinancing of the first and second mortgages on a nonrecourse basis and, having accomplished this refinancing, the original venturers' loans would lose their identity as such; that any joint financing arrangements would be available to all original venturers except that any joint financing among two or more of the original venturers and/or other venturers to purchase the ownership interest of an original venturer upon his failure to repay his pro rata share of the original venturers' loans was not required to be made available to all original venturers.

Regarding default in repayment of the original venturers' loans, the agreement contains the following:

"Section 9. In the event any Original Venturer fails or refuses to repay his or their pro rata share of Original Venturers Loans, or any refinancing thereof, or any due installment thereof, one of the following procedures may be pursued:

(a) after forty-five (45) days written notice the defaulting Original Venturer may be sued at law for the amount then due and owing;

(b) any other Original Venturer may pay (after five (5) days written notice) the defaulting Original Venturers' share and receive eight percent (8%) interest on any monies advanced, said interest to commence from the date of advancement. After forty-five (45) days written notice to the defaulting Original Venturer, the defaulting Original Venturer may be sued at law for the amount advanced in his (their) behalf plus interest as aforesaid; (c) any other Venturer (hereinafter the Purchasing Venturer) (as opposed to Original Venturers only) upon giving five (5) days written notice of his intent to all other Venturers (including the defaulting party) may

advance the pro-rata share then due, of the defaulting party. After the advance and after forty-five (45) days written notice to the defaulting party, the defaulting Original Venturer relinquishes and sells all right, title and interest in and to said defaulting Original Venturers' share of the entire Venture * * *. In consideration said Purchasing Venturer undertakes to pay all of the defaulting Original Venturers pro rata share of the Original Venturers Loans when and as they become due and to save the defaulting Original Venturer and hold him harmless from any claims arising out of said defaulting Original Venturers pro-rata share of the Original Venturers Loans. Said Purchasing Venturer undertakes to remove the defaulting Original Venturers name and signature from any renewals or refinancing of the Original Venturers Loans occurring after the defaulting Original Venturer has relinquished and sold all right, title and interest in the Venture. In the event that more than one Venturer desires to participate in the purchase of the defaulting Original Venturers' interest, the participation of each such Venturer shall be determined by utilizing the method set forth in Article VII, Section 6(d) herein. [Article VII is the article relating to termination. Section 6(d) provides for the purchase of a withdrawing party's ownership interest in the venture for the amount of its appraised value less his pro rata share of the venture's liabilities in a series of rounds.] (Any reference to the sale of the building in said Article and Section shall not apply to this Section 9(c))."

A further provision states that, except for disagreements regarding the appraisal procedure, any claim or controversy arising out of the agreement or the breach thereof will be settled by arbitration.

On July 14, 1972, plaintiffs notified defendant that $26,148.51 which they had advanced on his behalf to retire venture liabilities has been outstanding since February 5, 1972. On August 25, 1972, defendant replied that two fees—one of $12,000 due him in September and the other of $10,000 due on November 1—would, when received by him, be contributed to the venture. On October 17, 1972, defendant remitted $12,000, of which $10,565.03 was applied to reduce the balance owed to plaintiffs with the remainder ($1,434.97) treated as interest pursuant to section 9 of the joint venture agreement.

On August 3, 1973, plaintiffs sent notice to defendant that if he did not within five days remit $933.75, his pro rata share of a second mortgage payment then due and owing, it would advance such sum and within 45 days thereafter assume his interest in the venture pursuant to the terms of

section 9(c). Thereafter, defendant paid $933.75 on September 25, 1973, and $933.73 on October 19, 1973, to plaintiffs.

On November 28, 1973, plaintiffs notified defendant that between September 1 and November 1, 1973, it made four payments totalling $2,472.55 on his behalf and that if he did not remit such sum within 50 days, his interest in the venture would be forfeited. Subsequently, on January 10, 1975, plaintiffs notified defendant that pursuant to the terms of section 9(c) it became the owner (as of January 17, 1974) of his share in the venture and that its assumption of such interest did not operate as a waiver of its right to reimbursement of all advances made on his behalf up to and including January 17, 1974.

In April 1975, plaintiffs filed suit seeking reimbursement for advances made on defendant's behalf in the amount of $33,145.77 plus 8% interest during the time such advances were outstanding. Defendant answered the complaint admitting the existence of the joint venture agreement but denying that he owed plaintiffs the stated amount. In conclusion, he requested that the trial court dismiss the complaint but made no assertion that plaintiffs were contractually bound to arbitrate rather than litigate the matter. Thereafter, plaintiffs moved for summary judgment in the amount of $31,263.90 plus 8% interest thereon. Defendant moved to strike the motion for summary judgment and, for the first time, raised the question of arbitration. Contemporaneously with this motion to strike, defendant filed a counterclaim alleging that plaintiffs had acquired his ownership interest in contravention of the provisions of the joint venture agreement and thereby wrongfully deprived him of his equity in the venture.

Attached to plaintiffs' motion for summary judgment was the affidavit of Richard Jones, stating that between August 21, 1971, and January 7, 1974, plaintiffs advanced $42,157.14 (pro rata share of original venturers' loan payments) and $1,619.95 (pro rata share of other venture liabilities) for a total of $43,777.09 on defendant's behalf; that they had been reimbursed in the amount of $13,432.51; that $30,344.58 in advances remained unpaid; and that they received an interest payment in the amount of $1,434.97. The trial court, however, granted summary judgment in favor of plaintiffs in the amount of $33,145.77 plus 8% interest. This amount exceeded the amount stated in Jones' affidavit by $2,801.19 and failed to credit the interest payment of $1,434.97. The trial court also granted defendant leave to file an amended counterclaim and stayed execution on its judgment in favor of plaintiffs until the counterclaim was disposed of. Defendant's second amended counterclaim was then dismissed for failing to state a cause of action.

OPINION

Defendant first contends that the trial court erred by refusing to

dismiss plaintiffs' complaint because the matter involved should have been submitted to arbitration. We disagree.

■■ Where defendant, from the inception of the litigation, contests the existence of a valid and binding contract between the parties, waiver of the contractual right to arbitration cannot occur until such time as the trial court has found such contract to exist. (*People ex rel. Delisi Construction Co. v. Board of Education* (1975), 26 Ill. App. 3d 893, 326 N.E.2d 55.) However, when defendant admits the existence of the contract while submitting the issues which contractually are the subject of arbitration, to a court of law for decision he has waived his right to arbitration. *Applicolor, Inc. v. Surface Combustion Corp.* (1966), 77 Ill. App. 2d 260, 222 N.E.2d 168.

■■ Here, defendant in his answer to the complaint admitted the existence of the joint venture agreement but generally denied the remaining allegations of the complaint and asked that it be dismissed. Then, after participating in discovery for two years, defendant for the first time in his response to the motion for summary judgment asserted that the issues raised by the complaint and his counterclaim were subject to his contractual right of arbitration. We believe that this assertion came too late and, accordingly, that the trial court properly refused to dismiss the complaint for the failure of plaintiffs to first submit the dispute to arbitration. *Applicolor, Inc. v. Surface Combustion Corp.*

Defendant next posits that the trial court erred by granting summary judgment and, subject to the modification delineated below, we again disagree.

Summary judgment is properly granted where the movant by appropriate supporting documents negates the existence of a genuine issue of material fact and establishes his entitlement to judgment as a matter of law. (*Allen v. Meyer* (1958), 14 Ill. 2d 284, 152 N.E.2d 576.) Moreover, the opponent's general denial contained in his answer to the complaint is insufficient in itself to create a genuine issue of material fact. *Opalka v. Yellen* (1975), 31 Ill. App. 3d 359, 333 N.E.2d 738; *Washington v. Draper & Kramer, Inc.* (1973), 11 Ill. App. 3d 952, 298 N.E.2d 270.

Here, Jones' supporting affidavit, which was uncontradicted as defendant filed no counteraffidavits, established that between August 24, 1971, and January 7, 1974, plaintiffs advanced on defendant's behalf $42,157.14 (his pro rata share of original venturers' loan payments) and $1,619.95 (his pro rata share of other venture liabilities), totaling $43,777.09; that they had been reimbursed by defendant in the amount of $13,432.51; and that on October 17, 1972, they received an interest payment from him in the amount of $1,434.97. In light of the reimbursement provisions of the joint venture agreement relating both to the advances of original venturers' loan payments and of other venture liability payments, plaintiffs were, in

our opinion, entitled to judgment in the amount of $30,344.58 (the amount supported by Jones' affidavit) and 8% interest thereon, with an allowance for the previous interest payment of $1,434.97. Under the circumstances, to the extent it exceeds the amount supported by the record, we find that the trial court's order granting plaintiffs judgment for $33,145.77 plus 8% interest, without allowance for the previous interest payment, is erroneous. Therefore, this portion of the order appealed from must be vacated and the matter remanded with directions to enter judgment in favor of plaintiffs in the amount supported by the Jones affidavit.

Defendant next contends that the trial court erred when it dismissed his counterclaim for failing to state a cause of action. We agree.

■■■ A motion to dismiss admits all facts well pleaded, together with all reasonable inferences therefrom, and a court of review will vacate a dismissal where such facts and inferences raise a possibility of recovery. *Johnson v. North American Life & Casualty Co.* (1968), 100 Ill. App. 2d 212, 241 N.E.2d 332.

Concerning contract law, it has been generally held that:

"In construing contracts, to determine their intent, it is long established law that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other. [Citations.]" (*Coney v. Rockford Life Insurance Co.* (1966), 67 Ill. App. 2d 395, 399, 214 N.E.2d 1, 3. Accord, *Herbert Shaffer Associates, Inc. v. First Bank* (1975), 30 Ill. App. 3d 647, 332 N.E.2d 703.)

While each word in a contract should be given its plain and ordinary meaning (*Pierce v. MacNeal Memorial Hospital Association* (1977), 46 Ill. App. 3d 42, 360 N.E.2d 551; *Transcon, Inc. v. Motion Inc.* (1973), 14 Ill. App. 3d 61, 302 N.E.2d 135), an ambiguity exists where language is susceptible to different constructions (*American Employers' Insurance Co. v. Hopp* (1975), 31 Ill. App. 3d 132, 333 N.E.2d 557 (abstract); *General Casualty Co. v. Elam* (1972), 8 Ill. App. 3d 215, 289 N.E.2d 699; *National Wrecking Co. v. City of Chicago* (1970), 128 Ill. App. 2d 205, 262 N.E.2d 735), and it will be construed against the drafter who by choosing the words and grammar employed created the ambiguity (*Heifner v. Board of Education* (1975), 32 Ill. App. 3d 83, 335 N.E.2d 600; *Pescaglia v. Gianessi* (1973), 9 Ill. App. 3d 582, 295 N.E.2d 148; *Coney v. Rockford Life Insurance Co.*). Moreover, a court of review will not place a ridiculous construction upon contractual language (*Parker v. Arthur Murray, Inc.* (1973), 10 Ill. App. 3d 1000, 295 N.E.2d 487) or enforce a forfeiture

provision unless such provision is expressed in clear and unmistakable terms (*Peacock v. Feltman* (1927), 243 Ill. App. 236; *Sears, Roebuck & Co. v. Higbee* (1922), 225 Ill. App. 197; see also *Johnson v. Crouch* (1927), 325 Ill. 559, 156 N.E. 754; *Chicago Trust Co. v. 12-14 West Washington Street Building Corp.* (1934), 278 Ill. App. 117).

Here, defendant's second amended counterclaim, while lacking in artfulness, did allege that plaintiffs had wrongfully assumed his share in the venture in contravention of the terms of section 9(c) of the joint venture agreement and thereby deprived him of his equity in the venture. Section 9 provides that in the event any original venturer defaults in the payment of an installment of his pro rata share of an original venturer's loan or any refinancing thereof, *one* of three delineated procedures may be pursued—two of which are pertinent here. One, in section 9(b), provides that after a five-day written notice any other original venturer may advance such installment on behalf of the defaulting original venturer and that upon 45 days written notice the defaulting venturer may be sued at law to recover such advance, together with 8% interest. Another, in section 9(c), provides that after five days written notice any venturer, whether or not he has the status of an original venturer, may advance the installment and that upon 45 days written notice may force the sale of the defaulting venturer's ownership interest in the venture. On November 28, 1973, plaintiffs sent defendant a letter purporting to be a section 9(c) notice, which stated that between September 1 and November 1, 1973, it had advanced installments on original venturers' loans totaling $2,472.55 on defendant's behalf and that if he did not remit such sum within 50 days, his interest in the venture would be forfeited to plaintiffs.

Initially, we note that on its face the notice did not comply with the express terms of section 9(c) in that monies advanced on and prior to November 1, 1973, could not possibly be viewed as advanced after the five day notice was sent out on November 28, 1973. Moreover, plaintiffs wrote to defendant on January 10, 1975, notifying him that it became the owner of his interest in the venture on January 17, 1974 (50 days after November 28), and that its assumption of such interest did not operate as a waiver of its right to reimbursement for all advanced installments made on his behalf up to and including January 17, 1974. In addition, Jones' affidavit established that, pursuant to the terms of section 9(b), numerous installments advanced on defendant's behalf after November 28, 1973, were included in the judgment rendered in its favor. Therefore, upon the record before the trial court there appears to have been no advance made by plaintiffs on defendant's behalf for which plaintiffs did not choose the remedy of 9(b) to the exclusion of 9(c). On this ground alone, defendant's second amended counterclaim stated a basis for recovery, but for the reasons set out below

we believe that even assuming the existence of a single 9(c) advance, the second amended counterclaim stated a cause of action.

In support of the judgment below, plaintiffs argue that section 9(c) provides for the forfeiture of a defaulting original venturer's ownership interest in the venture upon the payment of his pro rata share then due by one venturer and upon the sole consideration that the purchasing venturer hold the defaulting venturer harmless from further liability on the original venturers' loans or refinancing thereof. However, section 9(c) expressly provides that if more than one venturer desires to participate in the purchase of the defaulting original venturer's ownership interest, the procedure set forth in article VII, section 6(d) shall be utilized. Such section provides for the purchase of a withdrawing party's ownership interest at the appraised value of such interest (as determined by disinterested M.A.I. appraisers) less his pro rata share of the venture's liabilities in a series of rounds whereby the purchasing venturers buy portions of such interest according to the size of their own interest in the entire venture. The application of article VII is limited, however, in that section 9(c) precludes the forced sale of the building even if the purchasing venturers through the round procedure fail to raise sufficient capital to purchase the entire interest of the defaulting original venturer. In light of such provision, we believe it would be incongruous to construe section 9(c) as entitling the defaulting original venturer to an appraisal and payment for his share of the venture if two or more venturers choose to invoke the remedy provided by section 9(c) but to deny him any equity if only a single venturer chooses to rely on section 9(c). See *Parker v. Arthur Murray, Inc.*

In addition, by providing that upon the default of a venturer the nondefaulting venturers in a unanimous action may terminate the venture and force the sale of the defaulter's ownership interest, article VII requires that they purchase that interest at its appraised value less concommitant pro rata share of venture liabilities. Thus, under this article, a defaulting party even if deprived of his ownership interest does not forfeit the equity which he has amassed in the venture. Nonetheless, plaintiffs would have us hold that a single venturer, if he so chooses, can force the forfeiture of such equity as a penalty for the same defaulting conduct. To support such a construction, they rely heavily upon the following language of section 9(c):

> "In consideration said Purchasing Venturer undertakes to pay all of the defaulting Original Venturers pro rata share of the Original Venturers Loans when and as they become due and to save the defaulting Original Venturer and hold him harmless from any claims arising out of said defaulting Original Venturers pro rata share of the Original Venturers Loans. Said Purchasing Venturer undertakes to remove the defaulting Original Venturer's name and

> signature from any renewals or refinancing of the Original Venturers Loans occurring after the defaulting party has relinquished and sold all right, title and interest in the Venture."

We find such reliance misplaced, for two reasons. First, if "[i]n consideration" was employed to mean "in sole consideration" and thereby work a forfeiture of the defaulting original venturer's equity in the venture, the phrase, in our opinion, is not expressed in the necessary clear and unmistakable terms to work such a forfeiture. (*Peacock v. Feltman; Sears, Roebuck & Co. v. Higbee.*) Moreover, even if we were to hold that the use of "[i]n consideration" was ambiguous, which we need not do, such ambiguity must be construed against plaintiffs, who drafted the joint venture agreement. (*Heifner v. Board of Education; Pescaglia v. Gianessi; Coney v. Rockford Life Insurance Co.*) Second, the language in section 9(c), holding the defaulting original venturer harmless on future installments of original venturers' loans or the refinancing thereof, is implicit in article VII relating to termination through its provision that if the venturers acting unanimously force the sale of the defaulting party's ownership interest and then purchase such interest in its entirety, the joint venture is terminated and immediately re-created with the only change being the reallocation of the percentage of ownership among the venturers remaining. Consequently, reading the entire contract in a harmonious fashion, as we are required to do (*Coney v. Rockford Life Insurance Co.*; 12 Ill. L. & Prac. *Contracts* §215 (1955)), we believe that article VII and section 9(c) of article X provide the same remedy and limitations in the event of default of an original venturer on a loan installment except that the former, requiring unanimity of the nondefaulting venturers, provides for the sale of the building under certain circumstances while the latter, not needing unanimity, precludes the sale of the building. (*Herbert Shaffer Associates, Inc. v. First Bank; Coney v. Rockford Life Insurance Co.*) We would note further that such construction necessarily requires either that the appraised value of the defaulting original venturer's interest be negative in character or that the purchasing venturer or venturers bind themselves to the payment of the entire appraised value of the defaulting original venturer's interest if such is positive in nature in order to take advantage of the provisions of section 9(c). As defendant alleged the wrongful assumption of his interest and consequent loss of equity in contravention of the provisions of section 9(c), we believe that the trial court erred by dismissing his second amended counterclaim.

Because of the view we have taken of this cause, it is unnecessary to discuss defendant's contention that he was a "withdrawing party" under the provisions of article VII, section 3(a)(3).

For the reasons stated, to the extent that the judgment appealed from granted summary judgment in favor of plaintiffs, it is vacated and that

portion of this matter is remanded with directions to enter judgment in favor of plaintiffs in the amount of $30,344.58 plus 8% interest thereon, with an allowance for $1,434.97 in interest already paid by defendant and, to the extent that said judgment dismissed defendant's second amended counterclaim, it is reversed and that portion of the matter is remanded for further proceedings not inconsistent with the views expressed herein.

Vacated in part.

Reversed in part.

Remanded with directions.

LORENZ and MEJDA, JJ., concur.