**Ronald THOMPSON, Plaintiff-Appellee, Cross-Appellant,**

**v.**

**AMOCO OIL COMPANY, a Maryland Corporation, Defendant-Appellant, Cross-Appellee.**

**Nos. 89-1797, 89-1887.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1990.

Decided May 31, 1990.

Fred B. Moore, Livingston, Barger, Brandt & Schroeder, Bloomington, Ill., Gary E. Persian, Randy V. Thompson, Smith, Persian, MacGregor & Thompson, Minneapolis, Minn., for plaintiff-appellee.

David M. Harris, Gayle G. Stratmann, Greensfelder, Hemker & Gale, St. Louis, Mo., Edward W. Huntley, Holley, Keith & Huntley, Springfield, Ill., Marguerite E. McDermed, Chicago, Ill., for defendant-appellant.

Dimitri G. Daskal, Washington, D.C., for amicus curiae.

Before CUDAHY, MANION and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Ronald Thompson, an Amoco dealer since 1972, moved his residence approximately three hundred miles away from Normal, Illinois, where he owned a service station, to Lake of the Ozarks, Missouri. Upon learning of the move, Amoco officials became concerned that Thompson's physical absence from the station would result in a loss of customer goodwill and a decline in profits. They became so concerned that they terminated Amoco's franchise agreement with Thompson when he refused to return to the vicinity of his station. Thompson sued Amoco, claiming that the

termination violated the terms of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* (1982), and the district court agreed. This appeal followed. We vacate and remand.

## I.

Ronald Thompson signed a franchise agreement—running from November 1, 1984, to October 31, 1987—to operate the Northtown station in Normal, Illinois.[1] Although Thompson operated a number of Amoco stations at this time (and has operated as many as four stations at once), only the Northtown station is at issue here. When he signed the agreement, Thompson resided in the Normal area.

In 1986, Thompson, citing personal reasons, moved from Normal to Lake of the Ozarks, Missouri. Amoco officials did not applaud the move: indeed, they met with Thompson to discuss the importance of the company's "hands-on" managerial policy with him and, in effect, to persuade him to return to Normal. They also told him that his prolonged absence amounted to a violation of Paragraph 15(f) of the Lease Agreement, which requires an Amoco dealer to "devote his personal attention upon the Premises to managing the business activities of the gasoline sales facility...." Still, Thompson refused to return to the Normal area, residing instead in Lake of the Ozarks where he engaged in other business activities while retaining the Northtown franchise.

After their failed attempts at persuasion, Amoco officials informed Thompson by registered letter on June 3, 1987, that they were terminating and nonrenewing his lease. Amoco cited two reasons for the termination and nonrenewal: first, Thompson's failure to comply with Paragraph 15(f) of the Lease Agreement, and second, the occurrence of an event "which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable...." *See* 15 U.S.C.

§ 2802(b)(2)(C) (1982). In response to this letter, Thompson filed suit, charging that Amoco's termination and nonrenewal of his franchise amounted to willful disregard of the provisions of the PMPA.

## II.

In *Brach v. Amoco Oil Co.,* 677 F.2d 1213 (7th Cir.1982), Judge Wood, writing for this court, explained that Congress "enacted the PMPA in an effort to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Id.* at 1216 (quoting S.Rep. No. 95–731, 95th Cong., 2d Sess. 15 ("Senate Report"), *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874). He continued by observing that Congress enacted the PMPA to allay three specific concerns:

that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

*Id.* (citing Senate Report at 17–19, 1978 U.S.Code Cong. & Admin.News at 875–77). Most important, "the one thing the Act is clearly intended to prevent is the appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern." *Id.* at 1220. The PMPA is thus Congress's attempt to decrease the disparity of bargaining power between franchisors and franchisees, and, as remedial legislation, it "'must be given a liberal construction consistent with its overriding purpose to protect franchisees.'" *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 720 (7th Cir.1985) (quoting *Brach,* 677 F.2d at 1221).

Consistent with these general goals, the PMPA generally discourages the termi-

---

**1.** The circumstances surrounding this case are recited in more detail in *Thompson v. Amoco Oil Co.,* 705 F.Supp. 1349 (C.D.Ill.1989). We pause here only to note the more pertinent facts regarding this appeal.

nation or nonrenewal of franchises. 15 U.S.C. § 2802(a) (1982). That the PMPA makes it difficult for a franchisor to terminate a franchise, however, does not mean that the PMPA makes it impossible: Congress has specified certain circumstances in which a franchisor may terminate or nonrenew. *See* 15 U.S.C. § 2802(b) (1982). Two of these exceptions to the termination bar served as the bases of Amoco's decision to terminate and nonrenew Thompson's franchise.

In order to prevail, Amoco need only demonstrate that *either* of its two bases of termination was justified under the PMPA. We shall examine each of these bases in turn.

### A. Devoting Personal Attention "Upon the Premises"

Amoco first claims that its decision to terminate Thompson's franchise is supported by Paragraph 15 of the Lease Agreement, which states:

> 15. Lessor shall have the right to terminate or nonrenew this lease, and any applicable franchise relationship under the Petroleum Marketing Practices Act or other applicable federal, state or local act of a similar nature, if any of the following events shall occur:
>
> .    .    .    .    .
>
> (f) Failure of Lessee, in good faith, to devote his personal attention upon the Premises to managing the business activities of the gasoline sales facility ... without first securing a written consent from Lessor.

Amoco argues that Thompson's prolonged absence from the vicinity of the Northtown station made it impossible for him to be physically present at the station (in order to "devote his personal attention *upon the Premises*"); therefore, Amoco claims that its termination was justified because Thompson failed to "comply with [a] provision of the franchise, which provision is both reasonable and of material signifi-

cance to the franchise relationship...." 15 U.S.C. § 2802(b)(2)(A) (1982).

The district court disagreed with Amoco's analysis on this defense. Announcing its decision from the bench, the court ruled that the phrase "upon the Premises" did not clearly require physical presence at the station. The court reasoned that since Amoco permits its dealers to operate multiple franchises, it could not have intended the lease to require these dealers to be physically present at every one of their stations all the time. *See* Trans. at 494–97; *see also Thompson v. Amoco*, 705 F.Supp. at 1353 (explaining previous ruling). "It is thus obvious," wrote the court, "that 'personal attention upon the Premises' does not require that a franchisee devote his exclusive attention to one franchise location. Hence, Clause 15(f) cannot be said to require actual physical presence upon the premises." 705 F.Supp. at 1353.

■ We review *de novo* a trial court's legal determination that contractual terms are ambiguous. *Air Line Stewards and Stewardesses Assoc. v. American Airlines, Inc.*, 763 F.2d 875, 878 (7th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *see National Tea Co. v. American Natl' Bank & Trust Co.*, 100 Ill.App.3d 1046, 1049, 56 Ill.Dec. 474, 476, 427 N.E.2d 806, 808 (1st Dist.1981). In conducting this review, we are guided by Illinois contract law:[2] "A contract is ambiguous when its terms are reasonably capable of interpretation in more than one way." *UIDC Management, Inc. v. Sears Roebuck & Co.*, 141 Ill.App.3d 227, 230, 95 Ill.Dec. 691, 693, 490 N.E.2d 164, 166 (1st Dist.1986).

Based upon this standard, we cannot agree with the district court that Paragraph 15(f) is "undeniably ambiguous." 705 F.Supp. at 1353. We agree with the district court that Amoco, by permitting its dealers to operate multiple stations, cannot interpret the contractual language to require full-time dealer presence at each station; however, we do not agree that the

---

**2.** We have previously recognized that federal courts must consult state contract law to construe franchise agreements governed by the PMPA. *See, e.g., Lippo,* 776 F.2d at 712; *Brach,* 677 F.2d at 1217–18.

conclusion properly drawn from this is that *no* dealer presence is required. The more reasonable conclusion, we believe, is that Paragraph 15(f) requires at least *some* degree of dealer presence at the station.

Thompson disputes this conclusion and argues that the phrase "to devote his personal attention upon the Premises" does not necessarily suggest physical presence: [3] "Quite simply, there are many instances where the English language uses the term 'upon' where no physical contact is required. For example: The youth reached the top of the mountain and gazed in wonder upon the valley below him. No one can seriously contend that the young man in question must be in physical contact with the valley." Appellee's Brief at 15. That the term "upon" is susceptible of various meanings in different contexts, however, does not demonstrate that the term suggests all these meanings within our specific context.

We examine the meaning of contract terms within the broader context of the contract as a whole. *Air Line Stewards & Stewardesses Assoc. v. TWA,* 713 F.2d 319, 321–22 (7th Cir.1983). Indeed, "[u]nless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part." *Cedar Park Cemetery Ass'n v. Village of Calumet Park,* 398 Ill. 324, 334, 75 N.E.2d 874, 880 (1947). In this case, our construction of Paragraph 15(f) is supported by the use of the term "upon the Premises" in other paragraphs of the same Lease Agreement: in these instances, the term is used specifically to denote physical presence. Lease Paragraph 12(d) forbids a dealer from permitting *"upon the Premises* any vending machines for contraceptives or other items of a nature which may offend an appreciable segment of the public"; Paragraph 12(e) prohibits a dealer from "stor[ing] or permit[ting] to be stored *upon the Premises* any wrecked or abandoned vehicles"; and Paragraph 25 permits a dealer to "remove any and all equipment, tools, fixtures, containers or machinery belonging to Lessee and placed or installed by Lessee *upon the Premises"* once the lease expires or terminates (emphasis supplied). The use of the term "upon the Premises" to denote physical presence in these paragraphs supports our interpretation of Paragraph 15(f).

Further, were we to hold that Paragraph 15(f) did not contain a physical presence requirement, we would *render meaningless* the phrase "upon the Premises." If, as Thompson contends, all that Paragraph 15(f) requires of dealers is that they direct their personal attention to the business activities of their stations, the phrase "upon the Premises" could be deleted from the lease without affecting the substantive rights of the parties. Since we try not to interpret contracts in a manner that would render specific contractual language mere surplusage, *Nice Ball Bearing Co. v. Lescure,* 227 F.2d 118, 120 (7th Cir.1955), we must reject Thompson's interpretation.[4]

Since the Lease requires some degree of physical presence at the station—and since such a requirement seems reasonable (given the district court's factual finding that Amoco "looks upon all of these dealerships as being family owned, family run, on the job out there on the deck, part and parcel

---

**3.** He also argues generally that contracts—and particularly contracts of adhesion—should be construed against the interests of the drafter. *See Epstein v. Yoder,* 72 Ill.App.3d 966, 973, 29 Ill.Dec. 169, 175, 391 N.E.2d 432, 438 (1st Dist. 1979). However, this canon of construction applies as a rule of last resort when the contract is ambiguous or unconscionable. *Franklin Life Ins. Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602, 616 (S.D.Ill.1978) (applying Illinois law), *aff'd,* 598 F.2d 1109 (7th Cir.) (per curiam), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). As explained above, we do not reach that point here.

**4.** We similarly reject Thompson's suggestion that he need not be physically present to focus his "attention upon the Premises." Since the lease requires Thompson "to devote *his personal* attention upon the Premises" (emphasis supplied), he clearly may not delegate all substantial responsibility to subordinates or associates. Thompson must personally ensure that the provisions of the lease (including storage of vehicles, equipment and other machinery) are obeyed. The only way he can fulfill this obligation is to be physically present at the station from time to time.

of the operation ... this is their policy, this is their procedure, this is the underlying approach they make to their entire operation," Trans. at 491) and material (given Amoco's economic interest in promoting the "personal" nature of its dealers and the purported economic loss suffered by the Northtown station due to Thompson's absence prior to the termination, 705 F.Supp. at 1357 & n. 2)—a dealer's total absence from the station constitutes a legitimate ground for termination or nonrenewal under the lease. 15 U.S.C. § 2802(b)(2)(A) (1982). Our conclusion, however, that the phrase "upon the Premises" denotes some degree of physical presence does not resolve precisely *how much* physical presence is required to satisfy the terms of Paragraph 15(f).[5] Unfortunately, the record sheds little light on this question.[6]

In order to determine whether Thompson, "in good faith, ... devote[d] his personal attention upon the Premises to managing the business activities of the gasoline sales facility," we must know precisely how regularly, if at all, Thompson visited the Northtown station. The touchstone of our inquiry must be Thompson's physical presence at the station, not the length of his commute to the station. Presumably, Thompson could move to Nome, Alaska without violating Paragraph 15(f) *so long as* he continued, "in good faith," to be physically present at the station within the terms of the lease. Without knowing how often Thompson returned to his Northtown station—or whether he returned at all—we

cannot determine whether he failed to comply with Paragraph 15(f). We therefore must remand the case so that the district court may determine whether Thompson was physically present at the station within the terms of the lease.

*B. Did Thompson's Absence Justify Amoco's Termination and Nonrenewal under 15 U.S.C. Section 2802(b)(2)(C)?*

Should the district court determine on remand that Thompson failed to satisfy Paragraph 15(f)'s dealer presence requirement, it need not consider Amoco's second line of defense, for the PMPA requires only one valid justification for termination or nonrenewal. Since the district court, in its earlier decision, considered Paragraph 15(f) to be ambiguous, it properly addressed Amoco's contention that Thompson's absence from the station constituted an "event" justifying termination within the strictures of 15 U.S.C. section 2802(b)(2)(C), which permits termination or nonrenewal upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable...." The district court rejected Amoco's contention that Thompson's absence constituted this "event," finding that his absence did not result in his inability " 'to provide for the continued proper operation of the premises.' " 705 F.Supp. at 1357. Amoco now asks us to review this decision.

**5.** Amoco attempts to resolve this question by contending that Paragraph 15(f) requires Thompson to be present at the Northtown station *whenever he manages his station.* Appellant's Brief at 20. Paragraph 15(f), however, clearly contains no such requirement on its face: that provision states that Thompson must "devote his personal attention upon the Premises *to* managing the business activities of the gasoline sales facility" (emphasis supplied), not that he must devote his personal attention upon the Premises *when* managing those activities. Further, even before his move to Missouri, Thompson delegated some responsibility (apparently, without complaint from Amoco) to a general manager who tended to many of the day-to-day operations of the business. Finally, it would be ludicrous to expect an independent dealer/operator, with substantial responsibili-

ties, to confine his business activities to his station's physical grounds: surely, if Thompson became ill, Amoco would not attempt to terminate his franchise if Thompson diligently phoned his employees from his sickbed to ensure that the weekly gasoline delivery had arrived.

**6.** The district court remarked that "Thompson did fail to be present at the station for at least three months," 705 F.Supp. at 1356, but it is unclear from the record whether this absence was continuous or sporadic in nature. To further complicate matters, both parties state in their briefs that Thompson returned to Normal approximately once per month, but neither explains which (if any) of the four stations he visited during his travels.

 

The peculiar procedural posture of this appeal, however, makes such review unnecessary. We have already determined that Paragraph 15(f) of the lease clearly requires Thompson's physical presence upon the premises of his service station from time to time, and that this requirement is both reasonable and material to the franchise agreement within the meaning of 15 U.S.C. section 2802(b)(2)(A). As a result, if the district court finds on remand that Thompson did not maintain a sufficient physical presence at the station to satisfy Paragraph 15(f), it must uphold Amoco's termination, *regardless whether Amoco demonstrates the reasonableness of its termination under the additional requirements of section 2802(b)(2)(C).* On the other hand, if the district court finds that Thompson did maintain a sufficient physical presence, Amoco will, by definition, be unable to demonstrate the occurrence of an "event" within the meaning of section 2802(b)(2)(C). Thus, in neither case would our review of Amoco's termination under section 2802(b)(2)(C) serve any purpose.

### III.

Thompson presents two issues in his cross-appeal, neither of which requires extensive discussion. The first issue, an evidentiary matter, is not properly before this court: Thompson prevailed below and does not seek alteration of the judgment on this ground. *See, e.g., Byron v. Clay,* 867 F.2d 1049, 1050–51 (7th Cir.1989) ("[Y]ou can't appeal from a judgment entirely in your favor.... A cross-appeal is an *appeal,* and is therefore in order only when a party wants to change (even if only conditionally) the trial court's judgment. We repeat our admonition against the filing of unnecessary cross-appeals."); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir. 1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). And the second issue, a request for attorney's fees as a "prevailing party" under the PMPA, is now moot given our disposition of this case.

### IV.

Amoco certainly could have stated its dealer presence requirement more clearly than it did in Paragraph 15(f). But that fact alone does not demonstrate that Paragraph 15(f) is ambiguous—that it is "reasonably capable of interpretation in more than one way," *UIDC Management, Inc. v. Sears Roebuck & Co.,* 141 Ill.App.3d 227, 230, 95 Ill.Dec. 691, 693, 490 N.E.2d 164, 166 (1st Dist.1986)—or that it is unenforceable. We therefore vacate and remand the cause for further proceedings not inconsistent with this opinion.

Vacated and Remanded with instructions.