FOX, Justice,
dissenting, in which KITE, Justice (Ret.), joins.
[187] I respectfully dissent because I believe that when Ms. Rosenberg became employed as Fremont County Fire Protection District's office manager, she was employed "as a controller, bookkeeper, CFO, Treasurer, or similar function with a private company" that was a client of the practice, and thus she violated the non-compete agreement.
[138] I would begin by noting that the reasonableness of the non-compete agreement is not at issue here, unlike the typical non-compete case in which the parties ask the courts to determine whether certain restraints are enforceable. See, e.g., Hopper v. All Pet Animal Clinic, Inc., 861 P.2d 531, 539-40 (Wyo.1998); Holland v. Holland, 2001 WY 113, ¶¶ 12-20, 35 P.3d 409, 413-15 (Wyo.2001). In this case, the parties have only asked us to determine what the contract says; they have not asked us to decide whether what it says is reasonable (other than to request we decide the duration is unreasonable, which the majority correctly points out is an issue not raised below).
[139] The distinction between a non-compete entered into in the context of the sale of a business and a non-compete entered into in the employment context is therefore not particularly significant in this case for purposes of determining which party has the burden of showing the restraints are reasonable or unreasonable. The sale of the business context remains important, however, for purposes of interpreting the contract.
[440] "[The fundamental goal of contract interpretation is to determine the intent of the parties." Whitney Holding Corp. v. Terry, 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo.2012). "We have said that we will construe contract language 'in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made.'" Wallop Canyon Ranch, LLC v. Goodwyn, 2015 WY 81, ¶ 35, 351 P.3d 943, 953 (Wyo.2015) (citations omitted).
[141] The context in which this non-compete was written is a sale of business which expressly includes the business's goodwill. "The goodwill of the business is often a more important aspect of the purchase of a business than the physical assets." WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc., 2007 WY 80, 114, 158 P.3d 651, 654 (Wyo.2007). Here, the Purchase Agreement valued goodwill at $160,000, nearly half the $350,000 total price. "The sale of 'goodwill' includes the seller's transfer to the buyer of his customers' confidence in him as an honest and knowledgeable businessman, and the seller's implicit recommendation to his customers to trade with the new proprietor." Gary P. Kohn, Comment, A Fresh Look: Lowering the Mortality Rate of Covenants Not to Compete Ancillary to Employment Contracts and to Sale of Business Contracts in Georgia, 31 Emory L.J. 635, 639 (1982).
[T42] A buyer's ability to capitalize on the goodwill that he has purchased is largely dependent on a seller's agreement not to *835 compete. See WSP, Inc., 2007 WY 80, ¶ 14, 158 P.3d at 654 ("An agreement by the seller to refrain from competition with the buyer can be critical to the transfer of goodwill. 'A transfer of goodwill cannot be effectively accomplished without an enforceable agreement by the transferor not to act so unreasonably to diminish the value of that which he is selling'" (Citations omitted.)). Here, the parties reinforced the transfer of goodwill with a non-compete agreement, to which they allocated $15,000 of the purchase price.
[143] Sale of goodwill "necessarily implies an obligation by the seller to deliver the business sold and to refrain from taking back that which he has sold[.]" Kohn, supra, 31 Emory L.J. at 689.
Covenants not to compete ancillary to the sale of a business or profession serve a useful economic function by enhancing the vendibility of a business or profession because the seller, by promising not to compete with the buyer, is able to receive the highest possible price for the property that is sold and the buyer is willing to pay a premium for the business or profession knowing it is protected by not running the risk of losing what was purchased should the seller become a competitor.
Weaver v. Ritchie, 197 W.Va. 690, 478 S.E.2d 363, 368 (1996).
[T44] The context in which the non-compete agreement was written, the surrounding cireumstances, the subject matter, and the purpose of the agreement, all compel the conclusion that the intent of the parties at the time the agreement was made was to prohibit Ms. Rosenberg from taking back what she had sold. What she had sold were the clients of the practice at the time of the sale.
[T45]) Use of the term "client(s) of the practice" throughout the contract likewise supports its meaning as a client at the time of the sale. "A 'cardinal principle' in our review of contracts is that 'a document should be read to give effect to all its provisions and to render them consistent with each other'" Herling v. Wyo. Mach. Co., 2013 WY 82, ¶ 52, 304 P.3d 951, 964 (Wyo.2013) (citation omitted). We also construe the contract as a whole, affording meaning to all of the language used. Shepard v. Top Hat Land & Cattle Co., 560 P.2d 7830, 782 (Wyo.1977).
[146] The term "clients of the practice" first appears in the Purchase Agreement when describing what the purchase includes:
The Practice: The goodwill of the practice, including the name, rights to provide accounting services to all clients of the Practice, a non-compete agreement from the Seller, the practice name, telephone numbers, email addresses and websites, and any and all copyrights, trade-names, logos, and any other intangible assets that may be used in the Practice.
(Second emphasis added.) This provision indicates that Mr. Pope purchased the right to provide accounting services to all clients that the practice maintained at the time of the sale since the practice could only sell the right to provide services to clients that it possessed at that time.
[147] The term is also used when the parties discuss the final purchase price adjustment. According to the terms of the Purchase Agreement, the price of the business would be adjusted after one year, depending on the amount billed over the twelve-month period following the sale. In that context, the contract states: "Billings are to include any unbilled work in process and will encompass any work performed for any clients of the practice, including new clients and new entities not directly originating from the buyer." (Emphasis added.) This provision distinguishes between "clients of the practice" on the date of the sale and new clients obtained in the twelve-month period following the sale. If the term "clients of the practice" encompassed clients at the time of the sale as well as future clients, there would be no need to include the additional language "including new clients and new entities."
[148] "Clients of the practice" is also used when describing the warranties and representations made by Mr. Pope-"Buyer shall make every effort to retain and properly service the clients of the Practice [.]" (Emphasis added.) The term "retain" indicates that Mr. Pope was to make every effort *836 to "keep or hold" clients in the business's possession. Webster's II New College Dictio-mary 968 (8d ed.2005). He could only keep or hold clients that the practice had serviced at the time of the sale. Any other reading of this provision would render it meaningless.
[T 49] Our rules of contract interpretation require us to construe the contract as a whole and interpret contractual provisions consistently. Shepard, 560 P.2d at 732; Herling, 2018 WY 82, ¶ 52, 304 P.3d at 964. The majority's interpretation would render meaningless or nonsensical the other provisions which include the language "client of the practice." We steadfastly avoid such interpretations. Id. The majority finds that the same language has two different meanings depending on its placement within the contract, which would not only require us to ignore the rule requiring us to construe a contract as a whole, but would also create confusion and disrupt the purpose of executing a contract. While the majority suggests that the parties should have defined the term if they wanted it to be read consistently throughout the agreement, our rules of contract interpretation assume a consistent application without resort to such a definition. See, eg., Thompson v. Amoco Oil Co., 903 F.2d 1118, 1121 (7th Cir.1990) ("[Ulnless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part." (Citation omitted.)); People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., 107 Cal.App.4th 516, 182 Cal. 151, 159 (2003) ("[The 'same meaning rule' [is] a rule of contract interpretation requiring that an identical phrase or word used in a contract be given the same meaning throughout the contract in the absence of anything in the contract suggesting otherwise."); Gustafson v. Alloyd Co., 513 U.S. 561, 570, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995) (In statutory construction, "identical words used in different parts of the same act are intended to have the same meaning[.]").
[150] Finally, the majority's dissertation on what "is" means is unpersuasive. Our task in contract interpretation is to examine the plain meaning of contract language "at the time the agreement was made." Wallop Canyon Ranch, 2015 WY 81, ¶ 35, 351 P.3d at 953 (citation omitted). The phrase, "is not a client of the practice" therefore refers to the time the agreement was entered into.
[151] I would find that "client of the practice" refers to those clients maintained by the practice at the time of the sale, which included the Fremont County Fire Protection District.