**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

--------

Michigan.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0299P (6th Cir.)
File Name: 02a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PDV MIDWEST REFINING,
L.L.C.; CITGO PETROLEUM
CORPORATION, individually
and as administrator of the
Uno-Ven Marketer
Agreements,
     *Plaintiffs/Counter
     Defendants-Appellees,*

     *v.*

ARMADA OIL AND GAS
COMPANY; ALLIE BERRY; ALI
K. JAWAD; SAM HADDAS,
     *Defendants/Counter
     Plaintiffs-Appellants.*

No. 00-2503

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-72287—George E. Woods, District Judge.

Argued: June 20, 2002

Decided and Filed: September 5, 2002

Before:  CLAY and GILMAN, Circuit Judges; HAYNES,
District Judge.[*]

———————————

**COUNSEL**

———————————

**ARGUED:** Jamal J. Hamood, Troy, Michigan, for Appellant. Faith E. Gay, WHITE & CASE, Miami, Florida, for Appellee. **ON BRIEF:**   Jamal J. Hamood, Troy, Michigan, for Appellant.  Faith E. Gay, WHITE & CASE, Miami, Florida, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Defendants Armada Oil & Gas Company, Inc. ("Armada"), Allie Berry, Ali K. Jawad, and Sam Haddas appeal the November 30, 2000 final judgment of the district court, after a bench trial, in favor of Plaintiffs, PDV Midwest Refining L.L.C. ("PDV-MR") and CITGO Petroleum Corporation ("CITGO"), on Defendants' counterclaim against Plaintiffs for violations of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq*. Specifically, Defendants contend that the district court erred in granting summary judgment in favor of Plaintiffs as to whether, under the PMPA, Plaintiffs' voluntary loss and/or sale of a trademark that Defendants had been granted a right to use constituted a valid reason for termination of the franchise relationship between Armada and a now defunct subsidiary of Plaintiffs' parent company.  Defendants also contend that the district court erred in its legal analysis and factual findings pertaining to the subsequent bench trial on

———————————

[*]  The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

As for the market withdrawal, Bednar confirmed at trial that market withdrawal was not the stated or intended reason for termination, so that the requirements under the PMPA related to market withdrawal were irrelevant and not met.  He also testified that market withdrawal was not a proper description of the restructuring because PDV-MR acquired all of UNO-VEN's assets and actually continued to market petroleum products in UNO-VEN's former territory.  He testified that it would have been misleading to classify the basis for the termination as a withdrawal from the market.

Defendants also contend that the real reason for the alleged "withdrawal" was so that PDV-MR could allow CITGO to convert the UNO-VEN stations to CITGO stations. Conners indicated that PDV-MR wanted to rebrand former UNO-VEN franchisees into CITGO stations.  Defendants contend that this was the real reason that Plaintiffs offered franchisees a year to use the Union 76 trademark.  It was Defendants' contention that Plaintiffs hoped that during the year Plaintiffs could convince franchisees to rebrand as CITGO stations. However, even assuming Plaintiffs may have had other motives for extending the one-year period, that does not negate their legitimate reasons for terminating the franchise. *See Gruber*, 570 F.Supp. at 1096.  In addition, one of the principal purposes of the Act is to prevent the appropriation of hard-earned good will that occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern.  *Thompson*, 903 F.2d at 1119.  Inasmuch as the stations that Plaintiffs took over were to be rebranded to other brands and CITGO did not intend to use the good will established with the Union 76 brand, Plaintiffs did not contravene the purposes of the PMPA in that regard.[9]

———————————

[9]Further, Plaintiffs point out that during this period, Defendants also convinced many stations to rebrand to British Petroleum ("BP"). In 1994, Armada entered into a ten-year contract with BP and began selling BP gasoline to some gas stations, which included rebranding some Union 76 stations to BP.  Currently, Armada is the largest BP distributor in

even assuming UNO-VEN and Unocal exited the geographic market, that still does not defeat the valid reason given for the termination.  *See Thompson*, 903 F.2d at 1120; *see also O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 597-598 (3d Cir. 1989) (explaining that "franchisor, defending a PMPA action, [may] not assert new reasons for the termination in court; the defendant must establish that the termination was proper under the PMPA based on the reasons that it gave to the franchisee in the notice of termination.").  In the instant case, Plaintiffs informed Defendants at the outset that the reason for the termination was because of an event under § 2802(b)(2)(C) and loss of the trademarks.  That position never changed.  In addition, even where the facts underlying the decision for termination reveal motives other than those given, this alone does not mean that a franchisor may not exercise its rights to terminate a franchise under the PMPA where the reasons given are valid.  *See e.g., Gruber v. Mobile Oil Corp.*, 570 F.Supp. 1088, 1096 (E.D. Mich. 1983).[8]

---

[8] In *Gruber*, 570 F.Supp. 1088, the franchisee had lease and franchise agreements with Mobile Oil Corporation ("Mobile").  *Id.*  Mobile failed to renew the agreements with the plaintiff because it claimed plaintiff failed to comply with the hours of operation under the lease agreement and failed to keep the premises clean pursuant to the franchise agreement.  *Id.* at 1089.  The plaintiff, however, contended that not only were those grounds not valid, but they were a pretext or sham for the real reason.  Apparently Mobile wanted to convert the station into a "gas & snack" station, without automobile repair service.  *Id.* at 1090.  The plaintiff argued that Mobile wanted to drive him from the property because the PMPA required that Mobile offer to sell its interest in the property, unless the plaintiff consented to the destruction and rebuilding of the property in order to convert it into a "gas & snack" station.  *Id.*  The plaintiff contended that because he did not want to consent to the rebuilding and because Mobile did not want to give up its interest in the property, Mobile used the other grounds for termination as a sham for its true reasons.  *Id.* at 1091.  The district court found that although there was some evidence indicating that Mobile did want to convert the station into a "gas & snack" station, despite the plaintiff's refusal to consent, these facts did not mean that defendants could not rely on the valid reasons that they asserted for non-renewal of the franchise.  *Id.* at 1096.

---

Defendants' PMPA claims.  For the reasons that follow, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### Procedural History

On May 14, 1997, Plaintiffs PDV-MR and CITGO filed a multi-count verified complaint against Defendants, alleging, among other things: (1) Plaintiffs had delivered goods for which they had not been compensated; (2) Quantum Meruit; (3) Breach of Guaranty Agreement (Against Jawad); (4) Anticipatory Breach of Contract; (5) Specific Performance; (6) Fraud; and (7) Recission of Transactions Induced by Fraud.  Plaintiffs' claims stemmed from allegations that Defendants had obtained petroleum products from Plaintiffs and failed to pay for them.  Defendants filed a countersuit alleging violations of the PMPA, and a claim of intentional interference with business expectancies and relationships against CITGO.

In their complaint, Defendants contended, *inter alia*, that the termination of the franchise relationship between one of PDV-MR's parent company's subsidiaries, the "UNO-VEN" Company, and Armada was not based on any ground under which such termination would be permitted under the PMPA. Defendants also alleged that the real reason for the termination was because of UNO-VEN's withdrawal from the marketing of motor fuel in the relevant geographic market. Defendants further alleged that the withdrawal was a sham, and in any event violated the PMPA for other reasons.

UNO-VEN and Union Oil Company of California ("Unocal"), one of UNO-VEN's general partners, named as third-party defendants, had been parties in this action. However, the remaining parties stipulated to the dismissal of those two companies from this suit, and PDV-MR and

CITGO agreed to assume any liability for violation of the PMPA on the part of either UNO-VEN or Unocal.[1]

Plaintiffs moved for summary judgment on their claims, and on October 1, 1999, the district court granted partial summary judgment in favor of Plaintiffs on their breach of contract and guaranty claims. The district court found that PDV-MR and CITGO were entitled to partial summary judgment as to $2,738,097.14, but that a material issue of fact existed as to another $574,098.93 to which Plaintiffs alleged that they were entitled. The district court also granted summary judgment in favor of CITGO on Defendants' interference with business expectancies and relationships counterclaim.

As for Defendants' PMPA counterclaim, the district court found that UNO-VEN had clearly stated its reasons for terminating its agreement with Armada as required by the PMPA. The district court recognized that at least one reason offered by UNO-VEN was that it had lost the right to use the Union 76 trademark. "Loss of a right to grant the right to use the trademark which is the subject of the franchise" is identified in the PMPA as a legitimate basis for franchise termination. *See* 15 U.S.C. § 2802(c)(6). Defendants contended, however, that this section does not apply where a franchisor's loss of the trademark can be categorized as "voluntary." The district court rejected this argument based on the weight of authority that had addressed that issue. However, the district court also found that a disputed issue of material fact precluded summary judgment in Plaintiffs' favor as to Defendants' claim that UNO-VEN's termination of the franchise relationship was based solely upon a withdrawal from a specific geographic market, as Defendants contended, or for the reasons cited by Plaintiffs, and whether termination of the franchise was made in good faith and in the ordinary

---

[1]In this regard, to avoid confusion and for simplicity, the word "Plaintiffs,"when used in this opinion, may refer to PDV ("Petroleos de Venezuela, S.A."), PDV-MR, CITGO, UNO-VEN and/or Unocal.

in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if (i) such determination -- (I) was made after the date such franchise was entered into or renewed, and (II) was based upon the occurrence of changes in relevant facts and circumstances after such date . . . .

*Id.*

Where the decision to terminate involves § 2802(b)(2)(E), a franchisor must meet the notice requirements set forth in § 2804(b)(2)(B), which means that they must "promptly provide a copy of such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area." *Id.*

Defendants argue that the notice requirements under § 2804(b)(2)(B) were not met inasmuch as no notice was provided to the governors of the states from which UNO-VEN withdrew. Defendants claim that this is significant because it shows why UNO-VEN and Unocal "undertook a sham transaction to terminate UNO-VEN's right to use the trademark" rather than to declare that those companies had decided to withdraw from the market.

Defendants point out that Thompson admitted that when Unocal ceased its involvement with UNO-VEN, a withdrawal from the market took place, and other testimony supported that both Unocal and UNO-VEN (the latter entity no longer existing), exited the geographic market.

We find Defendants arguments unpersuasive. First, there is no evidence that either the Unocal-Tosco or the Unocal-PDV transactions were shams or cover-ups for what Defendants claim was really a market withdrawal. Moreover,

to terminate a franchise, Plaintiffs here, which have offered two, albeit related and intertwined, reasons for the termination, certainly have met their burden of showing that termination was proper.[7]  *See Thompson*, 903 F.2d 118 F.2d at 1120.

### D.  Withdrawal from the relevant geographic market

As explained earlier, Defendants also argue that the real reason Plaintiffs terminated their franchise relationship with Armada was because Plaintiffs intended to withdraw from the market and not, as Plaintiffs contend, as result of loss of the trademark and/or UNO-VEN restructuring.  Defendants contend that they have produced evidence that the real reason for the termination was Unocal's decision to withdraw from the midwest market and that the specific notice requirements for such withdrawal were not met.  Pursuant to 15 U.S.C. § 2802(b)(2)(E), termination is proper

> [i]n the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and

---

[7]Pursuant to 15 U.S.C. § 2804(a) and (c), a franchisor must also meet general notice requirements to franchisees before terminating a franchise. That section provides that notification of the termination must be made not less than 90 days prior to the date on which the termination takes effect. § 2804(a)(2). In the instant case, termination took effect pursuant to the April 30, 1997 termination letter, in May 1998, and thus was clearly timely. Further, the statute also provides that the notification must meet other requirements set forth in § 2804(c) and (d). There is no issue in this case as to whether these requirements were met. The record clearly shows that they were and Defendants do not argue to the contrary. *Cf. Smith & Co., Inc. v. Motiva Enter. LLC*, 269 F.3d 70, 74 n.3 (1st Cir. 2001) (explaining that inasmuch as notice requirements under § 2804 of PMPA were undisputedly met, "it would serve no useful purpose" for the court "to discuss them in any detail").

course of business, as required by the PMPA.  Further, the district court found that factual issues existed as to whether UNO-VEN had complied with the PMPA's notice provisions regarding termination of the franchise.

The parties entered into a settlement agreement on June 16, 2000.  Pursuant to a stipulation entered into by the parties, final judgment in this action would be entered upon resolution of Defendants' counterclaim.  *Id*.  The dispute regarding the $574,098.93 was resolved pursuant to the settlement. Further, pursuant to the stipulation, the district court entered final judgment in favor of PDV-MR and CITGO in the amount of $3,015,387.12 plus interest on their breach of contract and guaranty claims.

The only issue remaining for trial was that part of Defendants' PMPA counterclaim that survived summary judgment.  The district court conducted a bench trial on that claim from June 23, 2000 to July 10, 2000.  On October 3, 2000, the district court filed its opinion, resolving all claims in favor of Plaintiffs, and entered final judgment in Plaintiffs' favor on November 30, 2000. Defendants subsequently filed a timely notice of appeal.

### Facts

PDV-MR and CITGO are subsidiaries of Petroleos de Venezuela, S.A. ("PDV").  PDV-MR and CITGO are Delaware corporations with their principal places of business in Tulsa, Oklahoma.  UNO-VEN was an Illinois general partnership with its principal place of business in Illinois. Armada is a Michigan corporation with its principal place of business in Dearborn, Michigan.  Armada is a distributor of petroleum products, primarily gasoline, some of which it distributes to independent retail gasoline stations under licensed brand names or trademarks of large oil and refining companies.

In 1989, PDV and Unocal entered into a joint venture to form UNO-VEN.  PDV and Unocal became 50 percent

owners of UNO-VEN from 1989 until the two parent companies decided to restructure UNO-VEN in the late 1990s.[2] Unocal brought marketing and a license to use the Union 76 trademark to the partnership, and PDV brought a fixed price crude oil supply agreement to the partnership. Pursuant to a trademark license agreement, UNO-VEN acquired the right to use the trademarks of its parent company Unocal.

In 1990, Armada entered into a contract with UNO-VEN to purchase Union 76-brand gasoline, which Armada then resold to independently owned gas stations. Armada became an UNO-VEN "jobber" which, as explained at trial, means essentially the same thing as marketer or distributor or franchisee. The agreement was renewed in 1995, and remained in effect throughout the relevant period of the UNO-VEN-Armada relationship. The agreement between the parties provided that UNO-VEN could terminate or non-renew its agreement with Armada for any reason permitted under the PMPA. Defendants Berry, Jawad and Haddas executed a written contract ("the Guaranty") that provided that they would pay any indebtedness owed by Armada to UNO-VEN.

PDV-MR president Jerald Thompson testified at trial that from its inception, the Unocal-PDV partnership was strained. The UNO-VEN deal had apparently been an economically disadvantageous endeavor for PDV. The crude oil supply agreement that PDV brought to the UNO-VEN deal contained a fixed margin provision that resulted in PDV supplying UNO-VEN with crude oil at a price substantially below prevailing market prices. PDV had tried to buy out Unocal's share in UNO-VEN because of the economic drain on PDV, but Unocal wanted too much money. Finally, in or around 1996, Unocal decided to exit the "downstream" segment of

---

[2]UNO-VEN was actually owned by subsidiaries of Unocal and PDV, Midwest 76, Inc., and VPHI Midwest, Inc., respectively.

supply UNO-VEN with crude oil at a price substantially below prevailing market prices. PDV had tried to buy out Unocal's share in UNO-VEN prior to 1996, but Unocal wanted too much money. Finally, in or around 1996, Unocal decided to exit the "downstream" segment of the oil industry, which involves the refining and marketing segment of the industry, and Unocal agreed to lower its asking price. PDV-MR paid approximately $250 million to purchase Unocal's share of UNO-VEN.

Further, as part of the restructuring, UNO-VEN's trademark license agreement was terminated. As part of Unocal's plan to exit the downstream segment of the business in an arms-length transaction, separate from the PDV-Unocal deal, Unocal sold its rights to the Union 76 trademarks to Tosco. UNO-VEN's relinquishment of its trademark rights was an essential part of the overall transaction. *Cf. May-Som*, 869 F.2d at 921-22 (explaining that the PMPA does not require a large scale divestiture undertaken for *bona fide* business reasons to be stymied by the right of individual franchisees to insist on a prior franchise relationship on exactly its former terms). Defendants have failed to point to a shred of evidence that would establish that the sale of the trademark to Tosco and UNO-VEN's related loss of the trademark were undertaken in bad faith. *See* 28 U.S.C. § 2802(c)(6); *see also Reyes v. Atlantic Richfield Co., ARCO*, 12 F.3d 1464, 1469-70 (9th Cir. 1993) (explaining that once a franchisor shows that termination occurred for a valid reason under the PMPA, franchisee is entitled to present evidence to show that the termination was based on an illegitimate criterion). Likewise, other than speculation, Defendants have failed to show that Plaintiffs' restructuring was not conducted in good faith and for valid business reasons. *Id.* Therefore, we hold that the restructuring and loss of the trademarks constituted a valid and reasonable basis to terminate the franchise. *Cf. Russo*, 630 F.Supp. at 688 (holding that large scale divestiture of assets, including trademark rights, constituted a sufficient basis for termination of franchise under the PMPA). Inasmuch as only one valid reason is needed under the PMPA

corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions." *May-Som*, 869 F.2d at 921. This Court also explained:

> There is nothing in the language of the [PMPA] suggesting that a major national acquisition and large scale divestiture for bona fide business reasons was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms. A permanent status quo in the relationships of major national oil corporations with each other was not mandated by Congress through the PMPA. In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors.

*Id*. (citing *Russo*, 630 F.Supp. at 688).

In evaluating an economic business decision as it pertains to the PMPA, Congress cautioned against courts applying the business judgment rule, that is, whether a particular business decision was wise. *Brach*, 677 F.2d at 1222-23. Rather, courts should determine whether the business decision at issue was made in good faith, a subjective standard, and whether the determination was made in the normal course of business. *Id*. "The good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises, . . . but avoid[s] judicial scrutiny of the business judgment itself." *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 767 (9th Cir. 1999) (citations and internal quotation marks omitted).

In the instant case, we agree with the district court that there is no evidence that the Unocal-PDV transaction regarding UNO-VEN was conducted in anything other than good faith. The evidence showed that UNO-VEN had been an economic drain on PDV-MR because the partnership agreement contained a fixed margin provision whereby PDV had to

the oil industry, which involves the refining and marketing segment of the industry.[3] Unocal's desire to exit the downstream segment of the market apparently led it to drop its asking price for its share of UNO-VEN, and resulted in Unocal and PDV entering into negotiations to restructure UNO-VEN.

On December 26, 1996, PDV and Unocal entered into a non-binding letter of intent ("LOI") regarding the restructuring of UNO-VEN. By its terms, the LOI was intended to provide a framework for continuing negotiations between the parties. It stated that the letter was "not intended to represent or constitute a binding agreement between, or commitment on the part of," either party, as "to the matters addressed" therein. PDV-MR President Thompson testified that during the first couple of months of 1997, CITGO became involved with the negotiations between PDV and Unocal, and during due diligence review, issues arose that threatened the deal, particularly issues surrounding environmental liability. Thompson testified that there was a three-to-four-week period in March 1997 when negotiations were suspended to allow the parties time "to consider their positions and have some whiff of a cooling-off period." He testified that during that period both sides withdrew and there was concern that no deal would take place. However, the negotiations did resume.

As part of the proposed restructuring of UNO-VEN, PDV and Unocal took steps to ensure that their intended transaction would be in compliance with the PMPA. Stephen Bednar, CITGO's senior corporate counsel, testified at trial that he

---

[3] At trial, Brian Connors, who served on UNO-VEN's executive committee on behalf of Unocal, explained the terms "downstream," "midstream" and "upstream." (J.A. at 997.) He testified that "[u]pstream is basically extracting oil, petroleum products from the ground. Downstream [involves the processes] from the refinery all the way to the marketplace, meaning refineries, terminals, marketing outlets. And midstream generally refers to pipelines." *Id*.

became involved with the UNO-VEN restructuring and worked with an outside attorney to assist with the PMPA compliance issues.

During negotiations, PDV became aware that as part of its decision to exit the downstream segment of the industry, Unocal had sold its Union 76 trademark to another company, Tosco Corporation. The parties dispute as to exactly when Tosco purchased the trademark. According to Defendants, CITGO Representative Marty Sedlacek testified at his deposition that at some point in 1996, before PDV and Unocal executed the December 26, 1996 LOI, Unocal already had sold its rights to the Union 76 trademark to Tosco. At trial, Sedlacek testified that he had been mistaken earlier. There was also other evidence at trial that the Tosco deal took place in 1997.

The restructuring of UNO-VEN was completed on April 11, 1997, pursuant to the Partnership Interest Retirement Agreement ("PIRA"). PDV acquired Unocal's 50 percent interest in UNO-VEN. PDV-MR agreed to pay approximately $250 million to Unocal to acquire substantially all of UNO-VEN's marketing and refining assets. The PIRA provided that PDV-MR could designate a party to administer UNO-VEN's franchise agreements (such as the one UNO-VEN had with Defendant Armada). PDV-MR designated CITGO to oversee this administration. The April 11, 1997 agreement also entitled PDV-MR to use the Union 76 trademark for the 12-month period after the closing date of the transaction.

CITGO sent a letter to all UNO-VEN distributors, including Armada, dated April 18, 1997, which provided initial notice of the UNO-VEN/PDV-MR contract reached on April 11, 1997. That letter stated that after UNO-VEN's refining and marketing assets were transferred to PDV-MR, "there will be a twelve (12) month transition period during which CITGO has agreed to supply [Union 76] branded petroleum products to [Armada]." During this transition period, [Armada] will be

similar to an event actually listed under the Act. *Brach*, 677 F.2d at 1219 (explaining that courts do not have *carte blanche* to define the parameters of § 2802(b)(2)(C) and that the enumerated list under § 2802(c) "was intended as a guide for the courts").

As explained above, § 2802(c)(6) explicitly states that loss of a trademark constitutes a permissible ground for termination. However, there are other sections under § 2802(c) that "involve situations where the occurrence of the event disables the franchisor from providing an essential element of the franchise [such as] 'loss of a franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease;' [or] 'condemnation . . . of the leased premises' . . . ." *Russo v. Texaco, Inc.*, 630 F.Supp. 682, 688 (E.D.N.Y. 1986) (citations omitted). As the district court in *Russo* noted, these events suggest a sort of "involuntary loss of the right to franchise by the franchisor." *Id*. Whether the event that triggered the decision to terminate can be characterized as voluntary or involuntary, however, is not dispositive, as it is the reasonableness of the decision to terminate that is critical. § 2802(c); *Russo*, 630 F.Supp at 688 ("Involuntariness is not . . . the *sine qua non* of reasonableness."). Further, as this Court has stated, although the PMPA's purpose is to regulate coercive relationships between franchisors and franchisees, and to protect franchisees from discriminatory and arbitrary practices, the PMPA struck a balance between those goals and "the interests of franchisors in freedom to transfer motor fuel marketing assets in response to changing marketing conditions." *May-Som*, 869 F.2d at 921. This Court explained that the PMPA "constituted a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose." *Id*. (citing *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir.), *cert denied*, 459 U.S. 833 (1982)).

Further, this Court has noted that in balancing the competing interests of the PMPA "in an age of increasing

The district court found that termination was proper, pursuant to 15 U.S.C. § 2802(b)(2)(C), as a result of the UNO-VEN restructuring, and pursuant to § 2802(c)(6), as a result of the loss of the trademarks. The district court acknowledged that the reasons provided by Plaintiffs regarding the termination were related, but the court analyzed them separately.

As for the restructuring, the district court explained that under the PIRA, UNO-VEN's internal structure changed drastically. Unocal sold its 50 percent ownership to PDV, and the latter then assumed all of UNO-VEN's assets. UNO-VEN's trademark was terminated, although UNO-VEN distributors were allowed to continue using the Union 76 trademarks until May 1998. We agree with the district court that the restructuring is an event that alone constituted a sufficient basis to terminate the franchise; however, we also conclude that we need not consider the loss of the trademark and the restructuring as separate events. The factual situation in this case is that both events occurred, are clearly related, and that as such, both events combined create a valid reason for the termination.

The restructuring is not an *event* enumerated as a ground for termination under § 2802(c). Under this circuit's jurisprudence, even where the relevant event that occurs is enumerated under 15 U.S.C. § 2802(c), this Court must still "scrutinize the reasonableness of the termination." *Marathon*, 889 F.2d at 1512. *But see Russo*, 808 F.2d at 225 ("Once having ascertained that an event is encompassed by one of the twelve enumerated events, a court need make no further inquiry as to the reasonableness of the termination.") (citing *Lugar*, 755 F.2d at 59). The district court scrutinized the reasonableness of the termination in the instant case to determine whether it was made in good faith and in the normal course of business. *See e.g., Brach*, 677 F.2d at 1223. When considering whether a non-enumerated event constitutes a permissible basis for termination, courts generally determine whether one of the enumerated events is

able to continue to use the [Union 76] marks, and accept the Union 76 credit card. During this transition period, [Armada's] UNO-VEN agreements will continue in place and be administered by CITGO." (J.A. at 604, ¶ 15.)

On April 30, 1997, UNO-VEN sent all Union 76-branded franchisees, including Armada, written notification of termination of the franchise relationship by certified mail, as required by the PMPA. This notification expressly stated that UNO-VEN terminates and/or non-renews the sales agreement and any franchise relationship, effective May 1, 1998. Armada received a second letter from UNO-VEN on April 30, 1997 as well, essentially providing the same information regarding the sale of all of UNO-VEN's assets to PDV; however, that letter pertained only to unbranded gasoline and not Union 76-brand gasoline. The letter pertaining to unbranded gasoline did not discuss the PMPA because unbranded contracts are not subject to the requirements of the PMPA.

On May 1, 1997, the UNO-VEN restructuring closed and CITGO began operating the former UNO-VEN assets, supplying Union 76-brand gasoline to UNO-VEN's franchisees. Between April 14 and May 6, 1997, Armada took over $3 million worth of Union 76-brand gasoline from UNO-VEN and CITGO and refused to pay for it. Armada's conduct in that regard formed the basis for Plaintiffs' lawsuit. On May 1, 1998, Armada's franchise with UNO-VEN was terminated as set forth in the April 30, 1997 notice of termination.

## DISCUSSION

### I.

This Court reviews a district court's order granting summary judgment *de novo*. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law.  FED. R. CIV. P. 56(c).  The Court must view the evidence and draw all reasonable inferences therefrom in a light most favorable to the non-moving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

After a bench trial, the district court's findings of fact will be set aside only for clear error. *See Burzynski v. Cohen*, 264 F.3d 611, 616 (6th Cir. 2001); *AM Intern., Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 998 (6th Cir. 1993); FED. R. CIV. P. 52(a).  "This standard does not entitle a reviewing court to reverse a district court's findings of fact because the reviewing court is convinced it would have decided the case differently." *Equal Employment Opportunity Comm'n v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 833 (6th Cir. 1996).  Further, where there are two permissible ways to view the evidence, the district court's decision to view the evidence in one of those ways as opposed to the other cannot be clear error. *Id.* (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985)).  The district court's conclusions of law, however, are reviewed *de novo. Burzynski,* 264 F.3d at 616.

## II.

Defendants assert several arguments on appeal.  Defendants challenge the district court's grant of summary judgment in Plaintiffs' favor as to Defendants' counterclaim under the PMPA.  Specifically, they argue that the district court wrongly determined that a voluntary loss of a trademark can serve as a valid means of terminating a franchise relationship under the PMPA.  Defendants also contend that the district court erred, after the bench trial, in ruling that Plaintiffs had presented valid bases for terminating the franchise under the PMPA and otherwise followed proper procedures under the

'Union 76' and '76' trademarks in perpetuity.")  Plaintiffs, as did the district court, point out that despite Sedlacek's deposition testimony, which he later claimed was wrong, Thompson, Bednar, and Conners each testified that Unocal sold the trademark rights to Tosco in March 1997, well within 120 days of when Defendants received their notice of termination and before the April 11, 1997 PIRA--which represented the agreement between PDV and Unocal regarding UNO-VEN.  In light of this evidence, we conclude that the district court did not clearly err in finding that the sale of the Union 76 trademarks closed on March 31, 1997, and at that time, Plaintiffs acquired knowledge of the loss of the trademarks. *See Burzynski*, 264 F.3d at 616; *see also* 15 U.S.C. § 2802(b)(2)(C)(i).[6]

---

[6]During oral argument, Defendants pointed to an unpublished district court opinion, involving a case in which Plaintiffs in the instant case were parties. *See Draeger Oil Co. v. UNO-VEN*, No. 99-C-317 (E.D. Wis Mar. 27, 2002) (granting motion for summary judgment in favor of PDV, Unocal and others as to franchisees' claims that the termination of the franchise relationships in that case violated the PMPA). In *Draeger*, the district court found that as of December 14, 1996, Unocal and Tosco executed an agreement that transferred Unocal's trademarks, including the Union 76 trademark, to Tosco, subject to the rights of UNO-VEN. *Id.* at *6-*7.  Defendants urge that we rely on that court's finding to conclude that the district court in this case erred in finding that the transfer of the trademarks occurred on March 31, 1997. However, *Draeger* does not explain the exact terms of the Unocal-Tosco agreement with respect to the trademarks, but provides that an agreement regarding the trademarks had been executed in 1996, subject to UNO-VEN's rights. Further, for their part, Plaintiffs point to another unpublished district court opinion which found that the Tosco-Unocal deal closed on March 31, 1997. *See Barman v. Union Oil Co.*, No. CIV. 97-563-AS, 2000 WL 13350555, at *2 (D. Ore. 2000). Considering the conflicting authority from other courts and the evidence before the district court in this case, including consistent testimony at trial that Unocal transferred its trademark rights to Tosco in March 1997, we believe that the district court did not clearly err in finding that the trademarks were transferred on that date. *See* FED. R. CIV. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.").

valid reason unless Unocal or UNO-VEN had actual or constructive knowledge of the loss of the trademark no more than 120 days before the official termination notice was issued on April 30, 1997. Defendants contend that Plaintiffs failed to meet their burden of showing that the Unocal sale of its trademark to Tosco occurred in March 1997, as the district court found. Defendants point out that Marty Sedlacek at his deposition stated that the trademark rights at issue were sold to Tosco months before the Letter of Intent was entered into on December 26, 1996. Further, Defendants point out that Thompson testified that PDV-MR's procuring the Union 76 logo was not discussed during any of the negotiations to which he was a party. However, Thompson never testified, as Defendants appear to contend, that Unocal had sold the Union 76 trademark or that he knew that Unocal had sold the trademark when the LOI was executed in December 1996. He testified that it was revealed at some point during the negotiation sessions that Unocal was in negotiations with Tosco to buy Unocal's West Coast refining marketing assets, and that PDV-MR found out about the sale sometime in March 1997.

The district court found as a matter of fact that on March 31, 1997, Unocal sold to Tosco the Union 76 trademarks along with all of Unocal's West Coast refining and marketing assets. We, of course, do not review this factual finding *de novo*, but rather for clear error. *Burzynski*, 264 F.3d at 616. The district court pointed out that PDV-MR's Thompson, CITGO Senior Corporate Counsel Bednar, and Unocal Representative Brian Conners all provided consistent testimony concerning the timing of the Tosco/Unocal transaction. Further, the district court found persuasive another published opinion that referenced the Tosco/Unocal transaction. *See Unified Dealer Group v. Tosco Corp.*, 16 F. Supp. 2d 1137, 1139 (N.D. Cal. 1998) ("On March 31, 1997, Tosco purchased from the Union Oil Company of California ('Union') the 76 Products Company which included approximately 900 service stations in California. Tosco also acquired the exclusive right to use the

PMPA in terminating the franchise. For instance, Defendants argue that even assuming that a voluntary loss of a trademark is a sufficient basis to terminate a franchise relationship, the district court erred in finding as a factual matter that Unocal's sale of its trademark rights to Tosco occurred on March 31, 1997, such that notice to Armada on April 30, 1997 that Plaintiffs were terminating the franchise was timely under the PMPA. Further, Defendants argue that Plaintiffs' "real" reason for terminating the franchise with Armada was UNO-VEN's withdrawal from the relevant geographic market area, and that where withdrawal from a geographic market is the reason that a franchisor relies upon to end a franchise under the PMPA, the franchisor must follow certain procedures that were not followed in this case. Below, after a brief discussion of the PMPA and some of the policies underlying the implementation of that act relevant to this appeal, we will address Defendants' arguments in turn.

### A. The PMPA

Congress enacted the PMPA in 1978 to create a uniform set of rules covering the grounds for termination and non-renewal of motor fuel marketing franchises, and "to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991) (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1216 (7th Cir. 1982) (citing S. Rep. No. 731, 95th Cong.2d Sess. 15, *reprinted in* 1978 U.S. Code & Cong. & Admin. News 873, 874)). Congress enacted the PMPA to allay three specific concerns: "[1] that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; [2] that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and [3] that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one." *Massey*, 942 F.2d at 343 (citation omitted). The "[m]ost important . . . thing the [PMPA] is intended to

prevent is the appropriation of hard-earned good will that occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern." *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1119 (7th Cir. 1990) (quoting *Brach*, 677 F.2d at 1220). Consistent with congressional intent, this Court "must grant the PMPA a liberal construction consistent with its overriding purpose to protect franchisees." *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir. 1989) (citation and internal quotation marks omitted). To that end, "[t]he PMPA prohibits termination of any franchise agreement or non-renewal of any franchise relationship except on the basis of specifically enumerated grounds and upon compliance with certain notification requirements." *Massey*, 942 F.2d at 343.

This Court has recognized, however, that in adopting the PMPA, Congress struck "an explicit statutory balance between the interest of franchisees in freedom from arbitrary and discriminatory franchise terminations and the interest of franchisors in freedom to transfer motor fuel marketing assets in response to changing marketing conditions." *May-Som,* 869 F.2d at 921. Thus, "although Congress . . . intended strong protection of the interest of franchisees[,] . . . in an age of increasing corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions." *Id.*; *see also Meghani v. Shell Oil Co.,* 115 F. Supp. 2d 747, 751-52 (S.D. Tex. 2000), *aff'd mem.*, 273 F.3d 1098 (5th Cir. 2001) (citing *May-Som* approvingly for this proposition).

A franchisee may bring a civil action regardless of the amount in controversy if the franchisor fails to comply with the termination requirements set forth in 15 U.S.C. §§ 2802 or 2803 of the PMPA. *See* 15 U.S.C. § 2805(a). "[T]he franchisee [has] the burden of proving the termination of the franchise . . . ." § 2805(c). In the instant case, there is no question that Plaintiffs terminated the franchise. Thus, the burden then falls on Plaintiffs (as franchisor) "to produce

and, more importantly, on the reasons for termination that they actually provided to Defendants.

As previously stated, the April 30 termination letter set forth two grounds for the termination: (1) that an event had occurred which is relevant to the franchise relationship and as a result of which termination of the franchise and non-renewal of the franchise relationship is reasonable, and (2) that UNO-VEN had lost the right to grant the use of the trademark which is the subject of the franchise.[5]

Pursuant to 15 U.S.C. § 2802(b)(2)(C), in order for notice of an event listed under § 2802(c) (such as notice regarding loss of a trademark) to be timely, the franchiser could not have acquired actual or constructive knowledge of the event that triggered the termination more than 120 days prior to the date on which notification of the termination was given. *Id.* Defendants contend that even if the loss of the trademark was the true reason for Armada's termination, it would not be a

---

[5] Defendants vehemently argue for the first time in their reply brief that the two purported reasons for termination really only constitute a single reason: loss of the trademarks. They contend that the April 30, 1997 letter specifically stated that "[b]ecause Unocal will no longer have an interest in refining and marketing assets, UNO-VEN's right to use the Unocal and 76 trademarks and credit card will be terminated." (J.A. at 1425.) Defendants argue that this language and no other language in the letter was specific enough to apprize them that Plaintiffs were asserting two reasons for the termination. *See e.g., Svela v. Union Oil Co. of Calif.*, 807 F.2d 1494, 1498 (9th Cir. 1987) (explaining that the reason for non-renewal must be specific enough for the franchisee to determine whether the non-renewal is based on a lawful ground). In any event, Defendants are mistaken. The April 30, 1997 letter stated that as a result of the transfer of assets to PDV, UNO-VEN will close its doors and its "employees will be separated from the company." (J.A. at 1425.) The letter further provided that "UNO-VEN will cease to operate as an ongoing refining and marketing company." *Id.* The letter also clearly stated that "[a]s a consequence of the transaction described above, *and* as a result of the termination of UNO-VEN's rights to use the Unocal and 76 trademarks and credit card," UNO-VEN terminates the franchise relationship. *Id.* (emphasis added). Therefore, two distinct reasons were given for the termination.

summary judgment, the district court nevertheless found that summary judgment was inappropriate as to when Plaintiffs acquired knowledge that they were to lose the trademark, which, as explained below, was important for purposes of insuring that Plaintiffs had complied with PMPA notice requirements. Similarly, the district court found that factual issues existed as to whether Plaintiffs' termination of the franchise was based on the reasons they advanced (loss of the trademark and the reorganization of UNO-VEN) or premised on the reason Defendants claimed, a decision on Plaintiffs' part to withdraw from the geographic market. Thus, those issues were not resolved until after trial.

### C. Reasons Offered for Termination

Defendants contend that even if loss of the trademarks was a valid reason for termination, Plaintiffs failed to comply with PMPA notice requirements regarding that specific reason for termination of the franchise relationship. Defendants also appear to argue that loss of the trademarks was in bad faith and the result of a sham business transaction undertaken so that Plaintiffs could avoid dealing with their franchisees under the PMPA. Defendants further contend that the district court clearly erred in concluding that Plaintiffs did not withdraw from the relevant geographic market. They contend that Plaintiffs' stated reasons for termination (restructuring and loss of the trademarks) are pretextual, and what really occurred was a withdrawal from the geographic market, which involves extra requirements in order that termination is proper under the PMPA, and that such requirements were not met here.

Plaintiffs argue that they provided Defendants with two valid reasons for their termination of the franchise, neither being withdrawal from the relevant market, and neither of which is pretext for what was really a withdrawal from the relevant market. Plaintiffs contend that their decision to end the franchise must stand or fall on at least one valid reason,

evidence to establish as an affirmative defense that such termination . . . was permitted under section 2802(b) . . . ." *Id.*; *Brach*, 677 F.2d at 1219.

With regard to the termination of franchises, § 2802(a) of the PMPA provides:

> Except as provided in subsection (b) of this section . . ., no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may . . . (1) terminate any franchise . . . prior to the conclusion of the term, or the expiration date, stated in the franchise; or (2) fail to renew any franchise relationship . . . .

15 U.S.C. § 2802(a)(1)(2).

Subsection (b) of § 2802 delineates some of the grounds for termination or non-renewal of a franchise relationship. That subsection states in pertinent part that a franchisor may terminate or fail to renew such a relationship if the following transpires:

> The occurrence of *an event which is relevant to the franchise relationship* and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence . . . (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given . . . .

15 U.S.C. § 2802(b)(2)(C)(i) (emphasis added).

Further, subsection 2802(c) lists 12 examples of events relevant to the franchise relationship that may form a proper basis for termination. That subsection provides in pertinent part:

As used in subsection (b)(2)(C) of [§ 2802], "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as

. . .

(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence of the franchisor, is related to action taken in bad faith by the franchisor.

15 U.S.C. § 2802(c), (c)(6).

Although there are 12 specific grounds outlined under § 2802(c) upon which termination or non-renewal is proper, the statute itself makes clear that this list is not exclusive, but merely illustrative. *See* 15 U.S.C. § 2802(c) (explaining that the events referred to in subsection (b)(2)(C) as being proper for termination or non-renewal "includes" those listed in subsection (c)); *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir. 1986). Legislative history supports this view. *See* 95th Cong., 2d Sess. 38, *reprinted in* 1978 U.S. Code Cong. & Admin. News 873, 896 ("The enumerated list is not exclusive."). Congress delegated to the courts the discretion to determine what events, other than those enumerated, constitute an event which is relevant to the franchise relationship as a result of which termination or non-renewal is reasonable. *Brach*, 677 F.2d at 1219 (explaining that Congress delegated to the courts the task of interpreting the scope of § 2802(b)(2)(C)).

Courts must carefully scrutinize the reasonableness of terminations whether or not the terminating event is specifically enumerated in § 2802(c). *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1512 (6th Cir. 1989) (citing

---

amended the PMPA in 1994.[4]  Further, when it amended the statute, which was well after *Russo* was decided, Congress could have made clear that "loss" of a trademark cannot be voluntary, as through a sale of the trademarks or other assets including the trademarks, but instead must be involuntary. Congress, however, did not do so.  As the Supreme Court has held, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).

Defendants further contend that whether voluntary or involuntary, the franchisor's right to grant the right to use a trademark cannot serve as a basis for the termination of a franchise where the loss the trademark resulted from the fault or negligence and occurred as a result of bad faith on the part of the franchisor.  Defendants contend that a fact question exists as to whether divestiture of the trademark rights in the present case was undertaken in good faith or merely taken to avoid the PMPA requirements.  Defendants obviously rely on language in § 2802(c)(6), which provides that the loss of the right to grant the right to use the trademark is a legitimate reason to terminate a franchise provided that such loss is not "due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor."  15 U.S.C. § 2802(c)(6). Defendants contend that where the loss of the trademark was in bad faith, such as through a sham business transaction, then § 2802(c)(6) may not serve as a valid means of termination under the PMPA.

While the district court concluded that loss of the trademark may be voluntary when deciding Plaintiffs' motion for

---

[4] *See* Pub. L. No. 103-371, § 3, § 102(c)(4), 108 Stat. 3484 (codified at 15 U.S.C. § 2802(c)(4)(B) (West Supp. 1996) (amending portions of PMPA pertaining to leases).

We believe that the district court did not err in finding that a loss of a trademark can be voluntary under the PMPA. *See Russo*, 808 F.2d at 227. As the Second Circuit noted, while there is no text in the legislative history regarding whether "loss" of a trademark under § 2802(c)(6) may be voluntary as it pertains to a legitimate reason to terminate a franchise under § 2802(b)(2)(C), legislative history and the weight of judicial authority regarding "loss" of a lease under § 2802(c)(4) indicates that the loss under that provision may be voluntary or involuntary. *Russo*, 808 F.2d at 227; *Hutchens*, 838 F.2d at 1142 n.1. Reading the word "loss" in the two subsections *in pari materia*, there is no reason why the same meaning should not be attributed to the word in both places. *United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1184 (6th Cir. 1982) (holding that "[i]n interpreting the meaning of one provision of an act it is proper that all other provisions *in pari materia* also be considered"). In *Stauffer*, this Court reasoned that since the term "representative" appeared in two sections of the Clean Air Act that both dealt with inspections by the Environmental Protection Agency, and the meaning of the term was clear as to one of the sections, the term should be construed consistently in both sections. *Id*. at 1184. Such reasoning favors finding that the district court in the instant case did not err inasmuch as the word "loss" appears in § 2802(c) twice, and that section deals exclusively with events that are relevant to the franchise relationship and as a result of which termination or non-renewal of the franchise relationship is reasonable. Because the loss of a lease may be voluntary, so too may the loss of a trademark. *Id*.

Plaintiffs also point out that if Congress intended to ascribe different meanings to the word "loss" in the two subparts of the same section, it could have done so expressly when it

*Darling v. Motor Oil Corp.*, 864 F.2d 981, 990 (2d Cir. 1989)). "[T]he grounds specified as justification for termination or nonrenewal of a franchise are intentionally broad enough to provide to franchisors the flexibility which may be needed to respond to changing market conditions . . . [but] not so broad as to deny franchisees meaningful protections from . . . discriminatory terminations . . . ." *Brach*, 677 F.2d at 1220 (citations and internal quotation marks omitted).

A franchisor needs to provide only one valid reason for termination under the PMPA. *See Thompson*, 903 F.2d at 1120 (explaining that where franchisor offered franchisee two reasons for termination, only one needed to be valid in order to justify termination under the PMPA). Thus, notice of a legitimate ground for termination is not made ineffective by defective notice for additional grounds for termination. *See Stuart v. Exxon Co., U.S.A.*, 624 F.Supp. 648, 653-54 (N.D. Tex. 1985). With that backdrop in mind, we turn to the various arguments raised in this appeal.

**B. Whether voluntary loss of a trademark may justify termination under the PMPA**

On April 30, 1997, UNO-VEN sent its franchisees official notice of termination. That letter stated:

On April 11, 1997, the owners of the UNO-VEN Company ("UNO-VEN") entered into a definitive agreement for the distribution of the refining and marketing assets of the company to an indirect wholly-owned subsidiary of Petroleos de Venezuela, S.A; which will become the owner of those assets. The transaction is scheduled to close on May 1, 1997. Because Unocal will no longer have an interest in the refining and marketing assets, UNO-VEN's right to use the Unocal and 76 trademarks and credit card will be terminated. UNO-VEN's general offices will be closed following completion of the transaction and its employees will be

separated from the company. UNO-VEN will cease to operate as an on-going refining and marketing company.

The asset purchaser has designated its affiliate CITGO Petroleum Corporation ("CITGO") to administer the orderly termination of UNO-VEN's contracts with customers. A termination notice period of one year after the closing of the transaction for continued use of the Unocal and 76 trademarks and credit card was negotiated as part of the transaction. CITGO will continue Unocal and 76 branded supply under your current agreements for the one year period following closing of the transaction. You will be contacted by a CITGO representative concerning ongoing operation of your marketership during the one year termination notice period.

Please refer to your Marketer Sales Agreement dated 1/1/95. As a consequence of the transaction described above, and as a result of the termination of UNO-VEN's right to use the Unocal and 76 trademarks and credit card, UNO-VEN hereby terminates and/or non-renews said Marketer Sales Agreement and does hereby terminate and/or non-renew any franchise relationship, effective as of May 1, 1998, one year from today's date. All agreements relating to the Marketer Sales Agreement are also hereby terminated and non-renewed as of the effective date, May 1, 1998.

In compliance with the provisions of the Petroleum Marketing Act, you are hereby notified that the grounds for the above action are that:

1. An event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise and non-renewal of the franchise relationship is reasonable.

2. UNO-VEN has lost the right to grant the use of the trademark which is the subject of the franchise.

This Termination and non-renewal notice affects your marketer relationship with UNO-VEN only. You may be

838 F.2d 1138, 1141 (11th Cir. 1988). The Eleventh Circuit relied on such cases as *Veracka* and *Lugar*, both of which were relied on by the *Russo* court. Particularly, *Hutchens* noted that the court in *Veracka* had pointed out that § 2802(c)(4) does not make reference to the cause of the underlying lease's termination, and legislative history suggests that Congress intended to include voluntary terminations to be within the scope of § 2802(c)(4). *Id.*

According to the Senate Report:

Expiration of the underlying lease could occur under a variety of circumstances including, for example, a decision by the franchisor not to exercise an option to renew the underlying lease. However, it is not intended that *termination* or *non-renewal* should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of expiration of which no substantive change in control of the premises results.

*Id.* (citing S. Rep. No. 731, 95th Cong., 2d Sess. 38, *reprinted in* 1978 U.S. Code Cong. & Admin. News 873, 896) (emphasis added).

The Eleventh Circuit held that "in deciding whether the termination of a franchisor's underlying lease falls within section 2802(c)(4) the cause of the lease's termination is not determinative. Rather, we must be satisfied that the termination represents an arms length transaction . . . ." *Id.* at 1141-42 (citing *Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1429 (9th Cir. 1983); *Veracka*, 655 F.2d at 448 ). Thus, "[a]s long as the franchisor's decision to relinquish its lease is an arms length transaction in which it actually gives up control over the premises, it makes no difference whether the relinquishment is accomplished through *cancellation* of the lease or a decision not to renew it." *Id.* at 1142 n.1 (emphasis added).

required to send notices of termination or non-renewal under the provisions of the Petroleum Marketing Practices Act to franchisees of your company, if any. It is your responsibility to determine the need for and method for compliance with any obligations you may have to your franchisees under the Act. UNO-VEN will not be sending any notices to your customers as no franchise relationship exists between UNO-VEN and its marketers' customers.

In accordance with the requirements of the Petroleum Marketing and Practices Act, enclosed herewith is a copy of the summary of the provisions of Title I of said Act as published by the United States Department of Energy.

. . . .

Sincerely,
The UNO-VEN Company

(J.A. at 1425-26.)

Defendants first argue that the district court erred in granting summary judgment on the ground that Unocal's sale of its trademark constituted a "loss of the franchisor's right to grant the right to use the trademark," as defined in the PMPA. *See* 15 U.S.C. § 2802(c)(6).

In *Russo*, 808 F.2d 221, the Second Circuit squarely addressed this issue. In that case, the appellants claimed that Texaco, Inc. violated the PMPA when it terminated their franchises. *Id*. at 222. Texaco decided to purchase certain assets of Getty Oil Company. *Id*. at 223. Because of the size of the purchase, Texaco realized that it might face antitrust violations if it did not divest certain assets it had acquired. Therefore, Texaco agreed to sell to Power Test most of Getty's gasoline station assets and supply contracts, among other things, but Texaco was to have retained ownership of the "Getty" trademark. *Id*. However, the Federal Trade Commission ("FTC") intervened in the Texaco-Getty transaction, as the agency believed that "'[c]ontrol by Texaco

---

underlying leases expired under their own terms and the franchisors made voluntary determinations not to renew those leases. Defendants contend that *Russo* cited no authority for the proposition that a franchisor can terminate an "unexpired" lease and use it as the basis for ending the franchise under the PMPA, such as occurred in this case with the trademark. Defendants essentially contend that *Russo* reached the wrong result because § 2802(c)(4) involves "expiration of an underlying lease," which by its terms *can* expire, which is different than the loss of a trademark, which may be held in perpetuity or for a long period of time.

While Defendants may be correct that the Second Circuit cited cases involving situations where the leases were going to expire on their own terms and the franchisors decided not to renew them, this does not mean that the authority relied on by the Second Circuit did not support that court's conclusion that a franchisor's decision to terminate or non-renew a lease can be either voluntary or involuntary. In one of the cases relied on by the court in *Russo*, *Veracka*, 655 F.2d 445, the franchisee contended that the franchisor had violated 15 U.S.C. § 2802(c)(4) of the PMPA when it elected to take affirmative steps to terminate a lease agreement that otherwise would have automatically been extended for another year, per the agreement's terms. *Id*. at 446-47. The First Circuit rejected the franchisee's argument that loss of a lease for purposes of terminating a franchise under the PMPA can occur only where such loss is "outside the control of the franchisor." *Id*. at 447. In the instant case, Defendants make an argument similar to that made by the franchisee and rejected by the court in *Veracka*, that "loss" as used in the PMPA was intended to apply only in situations where the loss was involuntary or the result of an occurrence outside of the control of the franchisor, and not, as here, where the loss might be considered voluntary.

After *Russo* was decided, the Eleventh Circuit also held that 15 U.S.C. § 2802(c)(4) "encompasses a franchisor's voluntary relinquishment of its lease." *Hutchens v. Eli Roberts Oil Co.*,

of Getty's marketing operations is likely to reduce price competition in the gasoline and middle distillate marketing provided by Getty . . . .'" *Id.* A final consent order required that Texaco divest in good faith its ownership of the Getty brand name and trademark. *Id.* at 224. On March 4, 1985, Texaco informed Getty dealers (the appellants in that action) that their franchise relationships would be terminated pursuant to 15 U.S.C. § 2802(b)(2)(C) of the PMPA. *Id.* Texaco asserted that the termination was based on the fact that it had lost the right to grant the use of the trademark that was the subject of the franchise. *Id.* (citing § 2802(c)(6)). The appellants responded by arguing, among other things, that the word "loss" in § 2802(c)(6) "implies an involuntary loss of the right to grant the right to use a trademark and that Texaco's divestment of the 'Getty' trademark was voluntary." *Id.* at 226. The Second Circuit rejected this argument. It found that "loss" as used in § 2802(c) intends to cover voluntary and involuntary situations. *Id.* at 227. It looked to the PMPA's legislative history as well as to decisions from other circuits to reach its holding. *Id.*

The court first noted that the word "loss" appears twice in § 2802(c), in § 2802(c)(4) (involving the franchisor's loss of the right to grant the franchisee use of the leased marketing premises) and § 2802(c)(6) (loss of a trademark). The Second Circuit noted that although the legislative history of the PMPA does not indicate the precise meaning of the expression "loss" as it relates to loss of a trademark under § 2802(c)(6), the legislative history "makes clear that where a franchisor's voluntary decision not to renew an underlying lease results in the 'loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease,' termination is nevertheless reasonable under § 2802(b)(2)(C)." *Id.* (citing Senate Report at 38, *reprinted in* 1978 U.S. Code Cong. & Admin. News at 896)). The court also pointed out that other circuits interpreting § 2802(c)(4) have construed "loss" to include a voluntary loss. *Id.* (citing *Lugar v. Texaco, Inc.*, 755 F.2d 53, 56 (3d Cir. 1985); *Veracka v. Shell Oil Co.*, 655 F.2d 445,

448 (1st Cir. 1981)). Relying on the doctrine of *in pari materia*, the Second Circuit held that there was no reason to treat the word "loss" differently inasmuch as it appears twice in the same section of the statute. *Id.* The Second Circuit explained that "[i]t is a settled principle of statutory construction that '[w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.'" *Russo*, 808 F.2d at 227 (citing *United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.), *cert. denied*, 436 U.S. 930 (1978) (quoting *Meyer v. United States*, 175 F.2d 45, 47 (2d Cir. 1949)).

Defendants urge this Court to reject the reasoning of *Russo* on several grounds, none of which we find persuasive. Defendants contend that the Second Circuit's lengthy discussion as to whether "loss" under § 2802(c)(6) can be voluntary was merely dictum, inasmuch as the court ultimately determined that because the FTC required Texaco to divest the Getty trademark, the loss of the trademark was involuntary. "Strictly speaking an obiter dictum is a remark made or opinion expressed by a judge, in his decision upon a cause, by the way—that is, incidentally or collaterally, and not directly upon the question before the court . . . ." Blacks Law Dictionary, 1100 (7th ed. 1999) (citation and internal quotation marks omitted). Although dictum is unnecessary to the decision, it may nevertheless be followed if "sufficiently persuasive." *Central Green Co. v. United States*, 531 U.S. 425, 431 (2001) (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935)); *see also* Black's at 1100 (although lacking precedential value, dicta "may be considered persuasive"). Even assuming that the Second Circuit's lengthy discussion regarding whether the voluntary loss of a trademark could be considered a loss under § 2802(c)(6) was dictum, we find that court's analysis of the issue well-reasoned and persuasive. *Id.*

Defendants next argue that the legislative history cited by the Second Circuit involved situations in which the